*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

GERALD RAYBORN,

> *Defendant-Appellant.*

No. 05-6894

>

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-20288—Bernice B. Donald, District Judge.

Argued: April 17, 2007

Decided and Filed: July 26, 2007

Before: MARTIN and DAUGHTREY, Circuit Judges; SCHWARZER, District Judge.[*]

---

**COUNSEL**

**ARGUED:** K. Jayaraman, LAW OFFICE OF K. JAYARAMAN, Memphis, Tennessee, for Appellant. Frederick H. Godwin, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** K. Jayaraman, LAW OFFICE OF K. JAYARAMAN, Memphis, Tennessee, for Appellant. Frederick H. Godwin, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Circuit Judge. On August 25, 1998, the New Mount Sinai Missionary Baptist Church in Memphis, Tennessee, was destroyed by a fire. The church's fiery pastor, Reverend Gerald Rayborn, was convicted of arson and mail fraud under 18 U.S.C. §§ 844(i) and 1341, respectively, for setting his church on fire and attempting to collect money from the church's insurance company after the fire. On appeal, Rayborn raises four challenges. First, he contends that his church was not sufficiently involved in interstate commerce to trigger the federal arson statute. Second, he claims that the evidence presented at trial was insufficient to establish guilt beyond a reasonable doubt on all charges. Third, Rayborn argues that evidence of his access to and control of church finances was inadmissible under Federal Rule of Evidence 404(b), and therefore,

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

the district court erred in allowing this evidence to be presented at trial. Finally, he challenges a particular rebuttal witness whom the government called to testify at trial. For the reasons outlined below, Rayborn's convictions are **AFFIRMED**.

I.

### A. Procedural Background Leading up to Second Trial

The New Mount Sinai Missionary Baptist Church in Memphis, Tennessee was destroyed by fire on August 25, 1998. On December 16, 1999, the church's pastor, defendant Reverend Gerald Rayborn, was indicted on one count of arson in violation of 18 U.S.C. § 844(i) and two counts of mail fraud in violation of 18 U.S.C. § 1341, based on an alleged attempt to collect money from the church's insurer after setting the church on fire. Rayborn entered a plea of not guilty and filed a motion to dismiss the indictment for failure to allege a crime, which the district court denied. Rayborn then filed a motion to reconsider. On August 25, 2000, the district court granted the motion and dismissed the charge of arson, concluding that his prosecution under the federal arson statute represented an unconstitutional extension of Congress's commerce power because the government failed to establish that the church was sufficiently related to interstate commerce, as required by the statute. Believing it lacked subject matter jurisdiction, the district court dismissed the arson charge.

On appeal, a panel of this Court reversed and remanded. First, the panel held that the district court erroneously concluded that the interstate commerce requirement in § 844(i) affected subject matter jurisdiction. *United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir. 2002). Second, instead of merely vacating the dismissal order, the panel examined the merits of the interstate commerce question and held that the district court ruled incorrectly. *See id.* at 232-35. Emphasizing facts such as the church's use of paid radio broadcasts as a regular part of its evangelism and its membership consisting of residents of three states, the panel held that "the government has provided sufficient evidence to permit a rational jury to find that the church was actively employed in commercial activities with an effect on interstate commerce." *Id.* at 235.

Rayborn's case was remanded to the district court, and Rayborn's first jury trial began on July 14, 2003. On July 28, 2003, the court declared a mistrial pursuant to the jury's announcement that it was unable to reach a verdict. Rayborn's second trial began on August 10, 2004.

### B. Facts Established at the Second Trial

#### *1. The Fire*

In the late afternoon of August 25, 1998, Trashonda Brown, Vatonia Gray, and Carolyn Woodard met at Woodard's house to discuss Brown's upcoming wedding, which was to take place at the New Mount Sinai Missionary Baptist Church. Gray called the church from Woodard's house and obtained permission from Rayborn to visit the church later that afternoon. Upon their arrival twenty to twenty-five minutes later, the women, finding the church's front door unlocked, entered and began looking around. Within about ten minutes, Rayborn appeared and introduced himself as the pastor. After a short conversation, he left the women alone in the church sanctuary. Shortly before 6:00 p.m., Gray realized that she would be late to pick up her son at football practice and called a friend to ask for assistance. Cell phone records that were introduced at trial showed this phone call occurring at 5:52 p.m.

Five or ten minutes later, the church lights flickered and then went out. The women heard a noise, described as "a loud boom," and Gray smelled smoke. The three women walked south toward the back of the church, where the pastor's office, secretary's office, tape room, and pastoral facility were located. (The pastoral facility was a small apartment-like area in the back of the church that included a bedroom, a hot tub, and showers.) They knocked on the door to the pastor's office

to see if Rayborn was aware of what was going on, but they received no response. From underneath the door to the secretary's office, the women observed smoke and a "glow" or "colors." They immediately left the church and called 911.

Johnny Allen, a construction worker, testified that he was performing work outside the church on the day of the fire. According to Allen, when the three women exited the church saying that they smelled smoke, he entered the church to investigate. Allen reported that he walked directly to the kitchen in the pastoral facility. Although he did not observe a fire at this time, he looked up into a vent in the kitchen and saw "redness." On cross-examination, Allen reported that the "redness" looked "like an electrical box or something just red, red, red." The government called Michael McGuire, an expert in electrical engineering and electrical fire investigations, as a rebuttal witness. McGuire testified that the National Electrical Code would not permit an electrical box to be located inside a vent where it could be seen from underneath.

When Rayborn took the stand, he testified that he left the church at approximately 5:30 p.m., after discussing wedding plans with the women. While on his way home, he stopped briefly to talk with Allen, who was working on the house Rayborn owned adjacent to the church. Following this conversation, Rayborn returned to the church to retrieve a document for Allen. This document contained the church's tax identification number, which Allen could use to get a discount on the construction materials.

Rayborn's mother-in-law, Lovenuia Banks, testified that on the day of the fire she was at Rayborn's house watching her grandchild. According to Banks, Rayborn returned home from the church and took a nap on the family's couch. When a neighbor informed Rayborn that the church was on fire, he rushed to the church. Edward Willingham, who lived in the house owned by Rayborn adjacent to the church, testified that he hurried to the church when Allen informed him and his wife of the fire. Soon after he arrived at the church, he saw Rayborn drive up and unlock the church's back door. According to Willingham's testimony, Rayborn asked him to retrieve a briefcase from the pastor's office, while Rayborn attempted to secure items from the church's garage, including a recreational vehicle. Rayborn's daughter and son-in-law also testified that Rayborn and others helped remove vehicles and other items from the church garage. The son-in-law indicated that he moved a motorcycle and helped Rayborn's wife move a full five-gallon can of diesel fuel.

Memphis firefighter Gregory Henderson also testified. According to Henderson, a civilian drove up to the Horn Lake fire station shortly after 6:00 p.m. to inform the firefighters that the church was on fire. Henderson notified the dispatch office and the firefighters responded in approximately one minute, as the church was located only a couple of blocks away from the fire station. When the firefighters arrived at the scene, Henderson observed a fire involving 40 to 60 percent of the church, with flames coming through the roof of the south end. Henderson asked Allen to lead him to the location within the church where he believed the fire started. As the two men walked from the front of the church toward the rear, the only indication of fire was a light haze of smoke near the ceiling and some electrical sparks falling to the ground. According to Henderson, the air was clear enough that he did not need to use his oxygen tank. Allen led him to the area where the smoke was, then pushed aside a ceiling tile with a broomstick, and the two men observed a fire burning in the attic overhead. Henderson and Allen then exited the building.

Memphis firefighter Steven Seward also testified. Seward entered the building as Henderson was exiting to try to determine the fire's origin. Like Henderson, Seward observed fire in the attic area then exited the building.

According to Henderson and Seward, they unraveled a hose line in order to fight the fire from within the church. However, once the hose was ready and the firefighters reentered the

building, the fire had become much worse. Seward testified that "there was a pretty dramatic change and we knew we didn't have much time. . . . it was a surprise to me, I fought a lot of fire but this one turned bad quick." Both men testified that the firefighters were soon ordered to exit the building because it was determined that the fire was too dangerous to continue fighting from inside.

### 2. *Fire Investigation*

The next morning, fire investigators from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) arrived at the scene to investigate the fire's cause and origin. According to Mark Teufert, a special agent certified fire investigator with the ATF, the team of investigators interviewed responding firefighters, Rayborn, and witnesses. They conducted a detailed observation of the scene, which included taking photographs and collecting evidence from the fire debris.

ATF criminal investigator Walter Hoback interviewed Rayborn, asking him a variety of questions about the church, his relationship with the church, and his activities the day of the fire. According to Hoback's testimony, Rayborn indicated that the New Mount Sinai Missionary Baptist Church was a fast-growing church, but prior to the fire, there had been no established plans to build an addition or a new church. When Hoback asked who had access to the church's funds, Rayborn explained that he not only had access, but had authority to write checks without the need for a cosigner.

Rayborn told Hoback that he was alone in the church on the day of the fire until the three women arrived at about 5:15 p.m. Rayborn indicated that the church's exterior doors were locked all day until he opened the front door for the women at around 5:00 p.m. In addition, Rayborn told Hoback that he and his wife were the only people with keys to the pastor's office, and that no flammable liquids were stored in the pastor's office, the secretary's office, or the tape room.

Cause and origin investigator Danny Benton testified that he walked through the scene with a K-9 dog that was trained to alert to the presence of fire accelerants, including gasoline, diesel fuel, lighter fluid, and paint thinners. According to Benton, during their tour of the church premises, when the K-9 alerted, Benton marked the location, and another investigator collected the relevant sample of fire debris for testing.

Fire investigator Ranold Jeffrey Williams described collecting the samples after the dog alerted, as well as collecting other debris samples during the investigation. Williams established a chain of custody, explaining that he put stickers on the samples to indicate where they had been found, stored the samples in the evidence room at the Memphis Fire Department, and then delivered them to the toxicology laboratory at the University of Tennessee.

David Stafford, director of the forensic toxicology laboratory and a professor in the pathology department at the University of Tennessee, analyzed the samples with the aid of a gas chromatograph. At trial, Stafford was certified as an expert in analytic and forensic chemistry, specifically the analysis of fire debris. Stafford testified that fourteen of the twenty-three samples collected at the scene tested positive for the presence of accelerant: three samples contained gasoline residue, seven samples contained diesel fuel or fuel oil residues, and four samples contained both gasoline residue and diesel fuel or fuel oil residues.

Teufert was certified as an expert in investigating and determining the cause and origin of fire. Teufert testified that he had previously encountered the presence of gasoline and diesel fuel in set fires. According to Teufert, gasoline is a dangerous and volatile product because it has a low ignition temperature and vaporizes very quickly. Diesel fuel, on the other hand, has a higher ignition temperature and is much more stable. Teufert explained that arsonists tend to combine the two accelerants to produce a substance with the volatility of gasoline and the relative stability of diesel fuel.

In addition to collecting samples with the assistance of the K-9, ATF investigators conducted a very detailed observation of the church premises in an attempt to determine the cause and origin of the fire. Teufert explained that once the debris from the fire was cleared enough to examine the condition of the floor, investigators found flammable liquid pour patterns on the floors of the secretary's office, pastor's office, and tape room. According to Teufert, a flammable liquid pour pattern typically results when flammable liquid is poured on carpeting then ignited; the carpeting and the backing absorb the flammable liquid and produce an extreme amount of heat when ignited, burning until the flammable liquid is entirely consumed. Teufert testified that fire investigators consider a flammable liquid pour pattern to indicate a set fire, unless flammable liquids are stored in the area of the fire's origin. Here, however, Rayborn had told Hoback that no flammable liquids were stored in the pastor's office, the secretary's office, or the tape room.

During their sweep of the church premises, the investigators found church offering envelopes twisted around an appliance cord inside the access panel of a freezer located in the church garage. According to Teufert, arsonists commonly use paper as an accelerant, igniting the paper to damage the appliance cord, which results in the interior of the appliance appearing as if there was an electrical failure.

After close examination of the church premises, ATF investigators ruled out all causes of the fire other than arson. Teufert testified that they determined the fire did not have an electrical cause after examining every appliance in the area of the fire's origin, including the church's electrical system and thirteen heating, ventilation, and air-conditioning units. Teufert told the jury that in his opinion, someone poured gasoline, diesel fuel, or both in the pastor's office, secretary's office, and tape room, and also ignited a fire in the southwest corner of the attic. In addition, Brian Hoback, an ATF investigator specializing in fires related to explosions and an expert in the cause and origin of fire investigation, testified that he inspected the gas lines and determined that the fire was not caused by a natural gas explosion.

### 3. Dealings with the Insurance Company

At trial, two employees from Grange Mutual Casualty Company (Grange), the church's insurer, testified to the insurance claim filed by Rayborn after the fire. Ronald Capeheart, an employee in the claims department, described inspecting the church premises after the fire and determining it to be "an obvious total loss." According to Capeheart, the church's insurance policy entitled it to receive $778,752 plus an automatic four percent increase with no requirement to rebuild.

Matthew Gray, supervisor of the special investigation unit at Grange, testified that he was involved in investigating the facts and circumstances surrounding Rayborn's claim. On August 28, 1998, Gray met with Rayborn and asked a variety of questions regarding the church and Rayborn's activities on the day of the fire. According to Gray's testimony, Rayborn informed him that he was alone in the church on the day of the fire until approximately 5:00 p.m. He told Gray that he always kept the doors to the church locked, even when he was there; on the day of the fire, all doors were locked except the front door, which he opened for the three women. Although both Rayborn and his wife had keys to the pastor's office, Rayborn indicated that only he had a key to the pastoral facility, and he maintained the three remote controls for the church garage doors. Finally, when Gray asked Rayborn about the presence of flammable liquids in the church on the day of the fire, Rayborn told him about a can of diesel fuel and two bottles of charcoal lighter fluid located in the garage.

Gray testified that the claims process required Rayborn to complete a sworn statement and proof of loss. According to Gray, this form is essentially a formal demand upon an insurance company for payment of a claim. Gray testified to mailing Rayborn a blank sworn statement and

proof of loss along with a postage-paid envelope in which to return the completed form to the insurance company. Grange received Rayborn's completed form on October 23, 1998, in the postage-paid envelope. The form was signed by Rayborn in the presence of a notary public and indicated that the total amount of the claim was $792,257.70.

### 4. *Use of the Church in Interstate Commerce*

At trial, the government presented a stipulation between the parties regarding the church's activities related to interstate commerce. Included among the stipulated facts was that the New Mount Sinai Missionary Baptist Church had approximately 6,000 members. Due to the church's location less than five miles from the Mississippi border and approximately fifteen miles from the border with Arkansas, the church's membership consisted of residents from all three states.

The stipulation described that the church regularly broadcast its services on four radio stations airing in the three states. Paying for the radio broadcasts was a regular expense of the church, totaling over $15,000 in 1996, almost $17,000 in 1997, and approximately $12,000 in 1998. The New Mount Sinai Missionary Baptist Church maintained a tape room within the church building in which it stored all of the pastor's radio broadcasts.

During one of these radio broadcasts, the church advertised a choir concert open to the public for which admittance was charged. In addition, the radio broadcasts regularly mentioned church-sponsored events that were free and open to the public, including buffet breakfasts every Sunday and regularly-sponsored church picnics.

### 5. *Church Finances*

At trial, the government presented testimony from two members of the church's Board of Trustees, Jacqueline Ford and Mattie Stewart. At the time of the trial, Ford had been a trustee for eight or nine years, while Stewart had served on the Board for twenty-one years. In addition to being a trustee, Ford testified to serving as the church's secretary, which included mostly financial responsibilities such as paying church bills and balancing the church's checkbook.

Both Ford and Stewart testified that Rayborn had power of attorney such that he could write checks on the church's bank account without a cosigner. Ford and Stewart were the only other people authorized to sign church checks, but each needed a cosigner. Through Ford, the government presented a number of checks written by Rayborn on the church's bank account between 1996 and the time of the fire. Some of the checks were written to "cash," some were written to "Gerald Rayborn," and others were written to pay personal expenses like Rayborn's credit card bills.

The church paid Rayborn a weekly salary of $500 in cash, and Ford testified that none of the checks were for his salary. Rayborn testified that he did not have a personal bank account prior to the fire, but indicated that he would pay the church back whenever he used church funds to pay for personal expenses.

Ford and Stewart testified that the Board of Trustees authorized various expenditures on Rayborn's behalf. The church bought multiple vehicles for Rayborn, including a Corvette and the recreational vehicle. The trustees authorized the construction of the pastoral facility — the small apartment-like area that included a bedroom, a hot tub, and showers. Ford and Stewart testified that Rayborn had the authority to make these expenditures, and Stewart said no member of the Board of Trustees or the congregation ever complained about his expenditures or his use of church funds.

Despite the government's intention to introduce more evidence of Rayborn's access to and control over church funds, Rayborn succeeded in excluding some of this evidence through motions *in limine* during both trials.

### C. Verdict and Sentencing

On August 20, 2004, after the conclusion of Rayborn's second jury trial, the jury returned a guilty verdict on all three counts of the indictment.[1] Rayborn moved for a new trial on August 26, 2004, which was denied. On April 13, 2005, the district court sentenced Rayborn to 60 months' imprisonment, to be followed by two years' supervised release. The judgment was amended on December 8, 2005, to provide that four and one-half months of Rayborn's sentence is to run concurrently with a sentence imposed in an earlier case.[2] Rayborn brought this timely appeal.

II.

### A. Interstate Commerce Element of Arson Statute

On appeal, Rayborn argues that his prosecution and conviction for arson under 18 U.S.C. § 844(i) was an unconstitutional exercise of Congress's commerce power. Specifically, Rayborn argues that the evidence in this case fails to establish that the New Mount Sinai Missionary Baptist Church was sufficiently used in interstate commerce. This argument is not well-taken.

A previous Sixth Circuit panel concluded that based on the facts alleged in the indictment and stipulated to by the parties, there was sufficient evidence of the church's interstate commerce activity, and therefore, Rayborn's prosecution under this statute could go forward. *See Rayborn*, 312 F.3d at 235. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The doctrine precludes reconsideration of issues "decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition." *Id.* (quoting *Coal Res., Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 766 (6th Cir. 1989)). The law of the case doctrine "is 'directed to a court's common sense' and is not an 'inexorable command.'" *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (quoting *Petition of U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973)). There are three exceptional circumstances under which a court will reconsider a previously decided issue: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Westside Mothers*, 454 F.3d at 538.

None of these exceptional circumstances is present here. First, the evidence before the district court regarding the church's interstate commerce activities is not materially different from the evidence considered by the previous Sixth Circuit panel. Both the previous opinion and the parties' stipulation at trial emphasize the church's regular use of radio broadcasts in Mississippi, Arkansas, and Tennessee as part of its evangelism, the church's membership consisting of residents of all three states, a gospel choir concert hosted at the church for which admission was charged, and the regularly-sponsored church events to which the general public was invited. *See Rayborn*, 312 F.3d at 234-35. In addition, no contrary view of the law has been decided by the Sixth Circuit or

---

[1] The first mail fraud count referred to Rayborn's causing Grange to mail him a blank Sworn Statement In Proof of Loss. The second mail fraud count referred to Rayborn's mailing of the completed Sworn Statement In Proof of Loss back to Grange.

[2] In another case brought against Rayborn, he was found guilty of one count of conspiracy to commit mail fraud, wire fraud, and money laundering under 18 U.S.C. §371, two counts of aiding and abetting mail fraud under 18 U.S.C. §§ 1341 and 2, and one count of money laundering under 18 U.S.C. § 1957. Rayborn was sentenced to 9 months' imprisonment. His convictions were affirmed by this Court in *United States v. Rayborn*, No. 05-6742, 2007 U.S. App. LEXIS 15742 (6th Cir. July 2, 2007).

the Supreme Court, and no legislation has amended the federal arson statute. Finally, the previous panel's decision cannot be described as "clearly erroneous" such that it would require reconsideration.

In sum, because the same evidence that was before the prior panel was presented at trial, and no other exceptional circumstances exist, the law of the case doctrine bars us from reexamining the interstate commerce element of the federal arson statute. We hold that there exists sufficient evidence of the church's effect on interstate commerce.

## B. Sufficiency of the Evidence

Rayborn next challenges the sufficiency of the evidence underlying his convictions for arson and mail fraud under 18 U.S.C. §§ 844(i) and 1341, respectively. "The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant . . . ." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (quoting *United States v. Maxwell*, 160 F.3d 1071, 1077 (6th Cir. 1998)). In analyzing this claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Under this standard, "[w]e 'view both circumstantial and direct evidence in a light most favorable to the prosecution,' and 'we draw all available inferences and resolve all issues of credibility in favor of the [factfinder's] verdict.'" *United States v. Wade*, 318 F.3d 698, 701 (6th Cir. 2003) (alteration in original) (quoting *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) and *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001), respectively). Because the factual bases for the two counts are closely related, we discuss them together.

Pursuant to the federal arson statute,

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

18 U.S.C. § 844(i). As explained above, the interstate commerce element of the arson statute is satisfied. Further, Ronald Capeheart testified at trial that the church was "an obvious total loss" as a result of the fire. Therefore, the only issue here is whether Rayborn maliciously destroyed the church by fire.

In order to support a conviction under the federal mail fraud statute, the government must prove beyond a reasonable doubt: "(1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). "The government need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property." *United States v. Ames Sintering Co.*, 927 F.2d 232, 235 (6th Cir. 1990), *quoted in Turner*, 465 F.3d at 681. At trial, various witnesses established the second element of the mail fraud statute for both counts by testifying that Rayborn's insurance claim induced Grange to mail him a blank sworn statement and proof of loss on August 31, 1998, and that Rayborn mailed the completed form on October 23, 1998. The first and third elements are related, as the government theorized that Rayborn intentionally set fire to the church in order to collect nearly $800,000 in insurance proceeds.

As Rayborn accurately points out in his brief, there is no direct evidence that he intentionally set fire to the church. However, "circumstantial evidence alone, if substantial and competent, may

support a verdict and need not remove every reasonable hypothesis except that of guilt." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (quoting *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999)). Indeed, even "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Winkle*, 477 F.3d at 413 (quoting *United States v. Yoon*, 128 F.3d 515, 523-24 (7th Cir. 1997)).

Rayborn argues that the circumstantial evidence presented at trial is "too ambiguous and tenuous" to sustain his convictions, and contends that it falls on the wrong side of the "line . . . drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction." Appellant's Br. at 42-43 (quoting *United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991)). But unlike *White*, where this Court found no evidence to support an inference of possession or intent to manufacture or distribute marijuana necessary to sustain the defendant's conviction for possession with intent to distribute, in the instant case, there was sufficient evidence for a jury to conclude that the fire at the church had been intentionally set, that Rayborn was the person who set the fire, and that he intended to defraud the insurance company and had a scheme to do so.

At trial, two ATF fire investigators testified that the church fire had been intentionally set. The ATF investigation included a detailed examination of the scene and interviews conducted with various people, including the three women planning the wedding, responding firefighters, and Rayborn. The investigation not only ruled out accidental causes of the fire, such as a natural gas explosion and an electrical fire, but also yielded affirmative evidence of arson. Fourteen of the twenty-three samples collected from the fire debris tested positive for gasoline, diesel fuel, or both, and ATF investigator Mark Teufert testified that arsonists tend to mix the two to produce a volatile yet stable accelerant. Even though Rayborn reported that no flammable liquids were stored in the pastor's office, secretary's office, or tape room, investigators discovered flammable liquid pour patterns in each room. Also, inside a freezer in the church garage, investigators found charred church offering envelopes wrapped around an appliance cord, a ruse commonly used by arsonists to make the appliance appear to have experienced electrical failure. Based on this evidence, Teufert theorized that someone poured gasoline, diesel fuel, or both in the pastor's office, secretary's office, and tape room, and also ignited a fire in the southwest corner of the attic.

Rayborn presented evidence that he claims cast doubt on the ATF investigators' conclusion that the fire was intentionally set. Two expert witnesses, Wolfgang Bertsch and Darlene Loprete, testified that David Stafford at the University of Tennessee forensic laboratory analyzed the samples incorrectly, suggesting that he should have used a mass spectrometer in addition to the gas chromatograph. Both witnesses also testified that they believed Stafford erroneously concluded that gasoline and diesel fuel were present in the samples. Loprete indicated that Stafford's results might have been caused by the presence of two substances in the samples: Tampro roofing adhesive, which was used when the church's roof was replaced in 1994, and Goof Off, a product used to remove gum or adhesive that was stored in the church's attic prior to the fire. Despite this testimony, Rayborn presented no expert testimony indicating a cause and origin of the fire different from the ATF agents' conclusion of arson. Therefore, viewing the evidence in the light most favorable to the government, a rational juror could conclude that the fire that destroyed the New Mount Sinai Missionary Baptist Church was set intentionally.

In addition, Rayborn himself told both ATF investigator Walter Hoback and insurance investigator Gray that he was the only person present in the church the entire day of the fire until approximately 5:00 p.m. Rayborn told the investigators that prior to this time, all exterior doors to the church were locked, as he regularly kept the church doors locked even when he was there. Thus, in the defendant's own words, he was the only person with the ability to start a fire from the inside the church.

Finally, Rayborn's fraudulent scheme and intent to defraud can be inferred from his setting the fire and then filing an insurance claim. The church had almost $800,000 worth of insurance. Although the church was the named beneficiary of the insurance policy, the evidence showed that Rayborn had access to and control over church funds such that he would have access to any insurance money collected. Viewing the evidence in the light most favorable to the government, a rational trier of fact could conclude that the government presented sufficient evidence of a scheme to deceive the insurance company and the requisite intent to defraud.

Therefore, we hold that sufficient evidence exists to support Rayborn's convictions for arson and mail fraud under 18 U.S.C. §§ 844(i) and 1341.

### C.  Admissibility of Evidence of Rayborn's Access to and Control over Church Finances

In his third issue on appeal, Rayborn argues that the district court erroneously allowed the government to present evidence of his prior conduct relating to church finances, claiming that such evidence was inadmissible under Federal Rule of Evidence Rule 404(b). Specifically, Rayborn disputes evidence introduced to show his access to and control over church finances, including specific transactions he made from the church bank account, evidence that he placed a king-sized bed, a hot tub, showers, and a kitchen in the pastoral facility located inside the church, and evidence that he used the church's tax-exempt status for personal purposes. In response, the government argues that this is not Rule 404(b) evidence, but that Rule 404(b) notice was only given in an abundance of caution. Rather, the government maintains that this is *res gestae* proof that is "inextricably intertwined" with the crimes charged.

The district court made the following rulings on the admissibility of evidence pertaining to Rayborn's access and control over church finances. Before Rayborn's first jury trial began, the government gave notice that it intended to present evidence of a sexual relationship between Rayborn and a church member, including evidence that Rayborn used church funds to make multiple $2,000 payments to the woman. The defense filed a motion *in limine* requesting that the government be barred from introducing any of this evidence. In response, the government argued that the evidence was "'inextricably intertwined' to prove the defendant's motive to obtain $792,000 in insurance proceeds and his access and control of the $792,000 once deposited into church's bank account." On June 25, 2003, the district court granted Rayborn's motion, finding that the evidence's probative value was substantially outweighed by the danger of unfair prejudice.

On June 27, 2003, the government submitted a notice of potential Rule 404(b) evidence, indicating that it intended to call auditor Lisa Foster to testify to Rayborn's personal use of the church bank account, listing nine types of such personal expenditures, including car payments, car insurance, credit cards, income tax, as well as checks signed by the defendant and made out to "cash" or to "Gerald Rayborn." According to the government, these expenditures were "'inextricably intertwined' to prove Rayborn's control and manipulation of the church bank account for his personal and financial gain." In response, the defense filed its second motion *in limine*, arguing that these specific expenditures had no probative value. The motion also noted Rayborn's concern that the prosecution would raise evidence of an alleged romantic relationship between Rayborn and a church member, despite the court's ruling on the first motion *in limine*. Just prior to the first jury trial, the district court issued an oral order granting in part and denying in part the defense's second motion *in limine*. The court denied the motion as to evidence of Rayborn's personal expenditures made from the church bank account during the years 1996 and 1997, stating: "[t]he government seeks to show that he had unfettered control [and] dominion over those charges and in order to show motive it is important for the government to be able to show those things." However, the district court granted the motion as to Rayborn's romantic relationship, reiterating "there will be no testimony about romantic relationship, mistresses, et cetera."

Before Rayborn's second jury trial began, he submitted a third motion *in limine*, asking the court for "an order barring the government from introducing or presenting at trial any testimony of the government's auditor, Lisa Foster (and other potential witnesses), concerning the church's purchase of vehicles and other such specific expenditures for the benefit of Reverend Gerald Rayborn." According to the defense, even though this evidence had been admitted during the first trial, the government should not be permitted to present it again, because Rayborn's dominion and control over church funds was not disputed. The motion also argued that the evidence was inadmissible under Federal Rule of Evidence 403, because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. In response, the government argued that in order to show the jury that Rayborn stood to benefit from the church's insurance policy even though he was not a named beneficiary, the government wanted to show that he "benefitted from the church proceeds previously and how he abused the church proceeds for his own personal benefit and gain." The district court granted Rayborn's motion, stating that "this evidence goes more to bolster the fact or to taint the fact that this was a person misusing the church." However, the district court ruled very narrowly, prohibiting only a financial analysis of the defendant's checks through the testimony of Lisa Foster and excluding evidence of a car that Rayborn allegedly purchased for a mistress. The district court explained: "I'm not stripping the government of the ability to get into that there might have been some personal use through other avenues where it came in [before], I'm not."

During trial, this issue arose again just before the government called Jacqueline Ford to the witness stand, when the defense objected in advance to her testifying to church expenditures and evidence of automobiles purchased for Rayborn in 1995 and 1996. Noting the defendant's objection for the record, the court permitted the testimony as covered by its broad ruling on the motion *in limine*.

Ford and Stewart testified to the church's finances. They explained that Rayborn had power of attorney such that he could write checks on the church's bank account without a cosigner. Through Ford, the government presented a number of checks written by Rayborn on the church's bank account between 1996 and the time of the fire. Some of these checks were made out to "cash"; some were written to "Gerald Rayborn"; others were used to pay Rayborn's personal expenses, such as credit card bills, car payments, car repairs, and income taxes. Ford testified that Rayborn was paid a weekly salary of $500 in cash, and none of these checks was for his salary. Ford and Stewart also testified to expenditures authorized by the Board of Trustees and the congregation for Rayborn's benefit, including the purchase of multiple vehicles and the construction of a pastoral facility within the church building. Ford and Stewart indicated that Rayborn had the authority to make these expenditures and that no one ever complained about the way the church was run.

In addition to arguing that evidence of these expenditures was improperly admitted, Rayborn also claims that the district court should not have allowed the government to present evidence that he used the church's tax-exempt status for personal purposes, namely, for construction on his adjacent personal property. In response to the government's notice of potential Rule 404(b) evidence, Rayborn filed a motion *in limine*, arguing that evidence he used the church's tax-exempt status for personal purposes should be excluded as lacking probative value. The district court agreed to exclude the tax form during the first trial. However, during Rayborn's second trial, the prosecutor asked Rayborn during cross-examination about the tax-exempt form in connection with his exit and return to the church building on the day of the fire. Although the defense raised no objection at the time, the following day, Rayborn's attorney objected to any further discussion of his use of the church's tax-exempt status for personal purposes. In response, the district judge did not address the objection regarding future testimony but said that she would let the previous testimony stand.

We hold that the district did not err in admitting the evidence discussed above.  However, we will not address the government's argument that the *res gestae* exception applies, for we find that the evidence is properly admissible under Rule 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

A three-part test set out in *United States v. Merriweather* is used to review the admissibility of evidence under Rule 404(b):

> [W]e first review for clear error the district court's factual determination that the 'other . . . acts' occurred.  Second, we examine *de novo* the district court's legal determination that the evidence was admissible for a legitimate purpose. Finally, we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.

78 F.3d 1070, 1074 (6th Cir. 1996).

With regard to the first factor, there was no dispute that the other acts at issue here did, in fact, occur.  As for the second factor, we must determine whether the other acts evidence was admitted for a legitimate purpose, and not "to prove the character of a person in order to show action in conformity therewith."

> Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered.

*United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003) (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir.2002)).  Here, evidence of Rayborn's personal expenditures using church funds, the lavish pastoral facility within the church, and his use of the church's tax-exempt status for personal purposes was offered to show motive, which is an admissible purpose under Rule 404(b).  And of course, Rayborn's motivation as to why he would set fire to the church was certainly at issue during his jury trial.  The evidence offered was probative with regard to motive, as Rayborn's access to and control over church finances suggested that he would also have access to and control over the money received from the insurance company even though he is not a named beneficiary.

Finally, *Merriweather*'s three-part test involves an analysis under Rule 403, examining whether the probative value of the other acts evidence is substantially outweighed by its prejudicial effect.  Because the evidence here deals with a pastor who may be betraying his church's trust, clearly there is cause for concern that "despite the 'technical' admissibility of the other acts evidence, the jurors are more likely than not to use the evidence for the very purpose for which the first sentence of the rule states that it may not be used." *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000) .  We do not believe that it was an abuse of discretion to admit this evidence. The district court carefully examined the probity and prejudicial value of each piece of evidence offered to show the defendant's control over church finances, by no means rubber-stamping all of the

evidence the government sought to admit. For example, it determined that some of this evidence was too prejudicial, such as evidence of Rayborn's extramarital affair with a church member and government auditor Lisa Foster's detailed analysis of each expenditure to determine whether it was for personal or church use. Although the evidence that was ultimately admitted may have prejudiced Rayborn somewhat, we do not believe that the prejudicial nature of this evidence substantially outweighed its highly probative value. Therefore, the district court did not err in admitting the evidence.

### D. Rebuttal Witness

Finally, Rayborn contends that the district court erred in permitting the government to recall Michael McGuire as a rebuttal witness. At trial, Johnny Allen testified as a rebuttal witness for the government. Because he had a longstanding relationship with Rayborn, however, the district court permitted the government to treat Allen as a hostile witness. While testifying, Allen described his actions on the day of the fire, including entering the church to look around after the three women exited saying that they smelled smoke. On cross-examination, Allen said that when he looked into the vent in the kitchen, he saw what looked like "an electrical box or something" and it appeared as "just redness." Over the defense's objection, the government recalled Michael McGuire to impeach Allen's testimony. McGuire, who had previously been qualified as an expert in electrical engineering and investigation of electrical fires, testified that the National Electrical Code prohibits placement of a junction box or electrical box inside a vent where it could be seen.

"The decision of the trial court to admit evidence on rebuttal is reviewed for abuse of discretion." *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005). Under Federal Rule of Evidence 611(a), "a district court must exercise reasonable control over the mode and order of presenting evidence with the goal that the presentation be effective for ascertaining the truth." *Id.*

On appeal, Rayborn argues that the district court abused its discretion in allowing McGuire to testify, because McGuire was used not to rebut evidence submitted by the defense but rather to rebut the testimony of the government's rebuttal witness, Allen. However, as accurately pointed out by the government, under both the Federal Rules of Evidence and case law of this Circuit, a party may impeach its own witness. *See* Fed. R. Evid. 607; *United States v. Causey*, 834 F.2d 1277, 1282 (6th Cir. 1987).

In addition, Rayborn's reliance on *Caraway*, 411 F.3d at 683, and *Benedict v. United States,* 822 F.2d 1426, 1428 (6th Cir. 1987), is unavailing, as the language he quotes from these cases is incomplete. Rayborn contends that McGuire should not have testified, because the government did not call him to "rebut new evidence or new theories proffered in the defendant's case in chief," as is the purpose of rebuttal evidence. *Caraway*, 411 F.3d at 683 (quoting *Benedict*, 822 F.2d at 1428). Despite defense counsel's creative attempt, the entirety of the quoted language from *Benedict* contradicts Rayborn's argument: "[i]n the exercise of sound discretion, the district court *may* limit the scope of rebuttal testimony to that which is directed to rebut new evidence or new theories proffered in the defendant's case-in-chief." 822 F.2d at 1428 (emphasis added and internal citation omitted). Although the district court can limit rebuttal testimony, it is not required to do so and it is not an abuse of discretion not to impose such a limit. Therefore, the district court did not err in allowing McGuire to testify as a rebuttal witness for the government.

### III.

For the reasons above, we **AFFIRM** Rayborn's convictions.