NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0100n.06
Filed: February 6, 2009

No. 07-4147

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

       v.

MARK C. OLDS,

    Defendant-Appellant.

On Appeal from the United States District Court for the Northern District of Ohio at Cleveland

_____/

**Before:**      **GUY, CLAY, and COOK, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**     Defendant Mark C. Olds was convicted by a jury of one count of mail fraud, 18 U.S.C. §§ 1341 and 2 (count 1); thirty-nine counts of money laundering, 18 U.S.C. §§ 1957 and 2 (counts 11-20 and 22-50); two counts of filing false tax returns, 26 U.S.C. § 7206(1) (counts 59-60); and two counts of failing to file tax returns, 26 U.S.C. § 7203 (counts 61-62). These charges are related to alleged fraud in the establishment and management of a community school located in Cleveland, Ohio. On appeal, defendant argues that the district court erred in allowing evidence that he had a prior felony conviction to be admitted at trial. Defendant also challenges the sufficiency of the evidence to support his convictions for mail fraud and money laundering. Finally, defendant argues that his sentence—a total of 92 months of imprisonment—is procedurally and

substantively unreasonable. After review of the record and the arguments presented on appeal, we affirm.

## I.

The Cleveland Academy of Math, Science and Technology (CAMST) was a privately managed community school that received funding from the State of Ohio. The state's funding for such a community school, or "charter" school, is based on the number of students enrolled on a full-time equivalency (FTE) basis. In 2001, Reverend Mark Olds contacted Tim Daniels, who had experience with starting a number of other charter schools. Daniels brought in a private management company named ABS School Services, and together they prepared the CAMST proposal that was submitted to the Ohio Department of Education (ODE) and the State of Ohio's Office of Community Schools (OOCS). CAMST's "development team"—consisting of Mark Olds, Shirley Haynes, and Savannah Robinson— was to be on the board of directors and enter into contracts with the State of Ohio.

After the proposal was approved in July 2001, Olds learned from someone at the OOCS that he could not continue to be a developer or be on the board of CAMST because he had a prior felony conviction. Olds remained heavily involved in the planning, but replaced himself on the development team with Sandra Brown.[1] Ultimately, rather than contracting with ABS Services as anticipated, Olds contracted to provide management services for CAMST through an entity he would later form called New Opportunity

---

[1] There was evidence that Olds filed the articles of incorporation for CAMST with forged signatures.

Development and Management Services (New Opportunity).[2]  Under that contract, New

Opportunity was to oversee operations, provide budget development and planning, and

supervise the collection and distribution of funds.  New Opportunity was to receive a lump-

sum payment for start-up costs and a management fee equal to 10% of the per-student

funding from the state.  Based on estimated enrollment of 600 students, the monthly payment

to New Opportunity was to be $30,900.  The contract also provided—as Daniels said he

discussed with Olds—that the monthly payments would be adjusted based on actual

enrollment.  No adjustments were ever made to the payments made to New Opportunity.

Shirley Haynes, a cooperating codefendant, was on the development team and served

as the treasurer of CAMST.  Haynes testified that she was responsible for reporting student

enrollment to the state on a monthly basis.  According to Daniels, the pre-opening estimate

of 600 students was a reasonable one given the level of interest expressed before the school

opened.  There is no dispute, however, that the expected enrollment never materialized.  The

school opened with fewer than 100 students in late September 2002.

The government maintained that actual enrollment never exceeded 135 students, while

CAMST consistently reported enrollment of more than 350 students.  In fact, the reported

enrollment ranged from a high of 681 students to a low of 162 students for the last month

before the school closed.  The evidence demonstrated that CAMST repeatedly overreported

the number of students enrolled at CAMST and received more than $1.3 million in

overpayments from the state that were never reimbursed.  The State of Ohio made payments

---

[2]Although the contract was entered into in May 2002, Olds did not file articles of incorporation for
New Opportunity until September 2002.

to CAMST that were sent through the United States mail. Olds and Haynes benefitted personally from the overpayments.

Olds, through New Opportunity, was responsible for managing the school. Needing a place to operate the school, Olds secured space in the Second Ebenezer Church starting in late September 2002. Olds arranged for the church to lease the space to New Opportunity—not CAMST—for $2,500 per month plus utilities and maintenance. Olds then charged CAMST $14,000 per month to lease the space for the rest of the 2002-2003 school year. Haynes wrote the checks to New Opportunity on behalf of CAMST, but testified that she never saw the lease.

In September 2002, Olds also found an old school building—located at 7115 Woodland—to purchase as a future site for CAMST. Olds directed Haynes to pay New Opportunity $202,000 to purchase the building, which she did. Six days later, New Opportunity purchased the building itself for $200,000. Olds also had Haynes pay more than $100,000 to third parties for renovation work. At the same time, however, Olds directed Haynes to have CAMST pay New Opportunity $20,000 per month to lease the Woodland building (an amount that was purportedly comparable to the prevailing market rate). In 2004, after CAMST closed, Olds and New Opportunity sold the Woodland building for $560,000 and did not report the sale to the IRS nor were any of the funds returned to CAMST. In addition, another entity previously established by Olds, MCO Media, Inc., received more than $200,000 from New Opportunity for unknown services.[3]

---

[3]Haynes operated the Haynes Group, which provided administrative and janitorial services under a contract with CAMST. She also operated Academy Transport, which provided transportation services to

CAMST operated out of the Woodland building from September 2003 until the school closed in December 2003. One teacher testified that despite the renovations, the building lacked heat and had problems with nonfunctioning lavatories. Also, when the school closed, she was owed eight weeks of pay. A review conducted on behalf of the ODE in August and September 2003 revealed the discrepancy between the 125 students on CAMST's enrollment list and the 350 students being reported to the state. CAMST was notified of the overpayments, and Daniels testified that he worked with Olds on a plan to cut the budget so the state could begin to recoup the overpayments. Negotiations with ODE and OOCS representatives to keep the school open were unsuccessful. The state issued warrants to CAMST in November 2003, December 2003, and January 2004, which were all voided and returned.

The Superceding Indictment filed in February 2007 charged Olds, Haynes, CAMST, New Opportunity, MCO Media, and Academy Transport with mail fraud, or aiding and abetting mail fraud, through the fraudulent reporting of enrollment to the ODE and receipt of more than $1.3 million in overpayments from the State of Ohio (count 1). Haynes was charged separately with mail fraud based on her receipt of unemployment benefits while employed and under a fictitious social security number (counts 57-58). In 54 counts of money laundering, or aiding and abetting money laundering, defendants were charged with engaging in monetary transactions of more than $10,000 derived from specific unlawful activity—namely, the mail fraud charged in count 1. Those charges pertained specifically

---

CAMST, but none of the vehicles provided to CAMST had passed inspection. Academy Transport received a total of $289,586 from CAMST, although the contract only required payment of $127,320.

to the payments that Haynes and CAMST received from the state (counts 2-10); the payments that Olds and New Opportunity received from CAMST (counts 11-36); the amounts that Olds and MCO Media received from New Opportunity (counts 37-50); and the payments that Haynes and Academy Transport received from CAMST (counts 51-56). Count 21, however, was dismissed before trial.

Apart from the mail fraud and money laundering, Olds was also charged with failing to report income from CAMST on the federal income tax returns he filed for 2002 and 2004 (counts 59 and 60), and failing to file income tax returns on behalf of New Opportunity and MCO Media for 2003 (counts 61-62). Haynes was charged with filing false tax returns for 2002 and 2003, and failing to file a tax return on behalf of Academy Transport for 2003 (counts 62-67).

Haynes pleaded guilty, admitted receiving $190,000 as a result of the fraud, and testified against Olds at trial. Daniels, who was charged in the original but not the superceding indictment, was also a witness at trial. Trial was conducted on the charges against Olds, New Opportunity, and MCO Media. Olds did not testify, and no other witnesses were offered in his defense. The jury found defendant guilty on all counts. The district court sentenced Olds to concurrent terms of: 92 months on counts 1, 11-20, and 22-50; 36 months on counts 59 and 60; and 12 months on counts 61 and 62. This appeal followed.

## II.

### A.    Sufficiency

Olds argues that the evidence was insufficient to establish that he acted with the specific intent to defraud required to convict him of mail fraud and, therefore, that the evidence was also insufficient to establish that the monetary transactions underlying the money laundering convictions involved property that was criminally derived from that mail fraud. The district court denied defendant's motion for judgment of acquittal, and we review that decision *de novo*. *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). The relevant question in reviewing the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).

For mail fraud, the government must prove a scheme to defraud, use of the mails in furtherance of the scheme, and intent to deprive a victim of money or property. *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007), *cert. denied*, 128 U.S. 1870 (2008). The jury was instructed, consistent with Sixth Circuit Criminal Pattern Jury Instruction 10.01, that it must find each of the following elements beyond a reasonable doubt:

> First, that the defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property, as follows: The defendants are accused of a scheme in which fraudulent monthly reports representing inflated enrollment numbers were provided to the Ohio Department of Education, and defendants thereby received approximately $2.2 million in school foundation payments, of which approximately $1.37 million constituted overpayments, in the form of [S]tate of Ohio warrants issued by the Ohio Auditor of State's Office and mailed to the Cleveland Academy of Math,

Science, and Technology.

Second, that the scheme included a material misrepresentation or concealment of a material fact. Third, that the defendant had the intent to defraud; and fourth, that the defendant used the mail or caused another to use the mail in furtherance of the scheme.

Intent to defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to another or bringing about a financial gain to oneself. *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir.), *cert. denied*, 128 S. Ct. 442 (2007); *United States v. Frost*, 125 F.3d 346, 371 (6th Cir. 1997).[4]

Defendant relies on Daniels's testimony that the preliminary estimate of 600 students was reasonable given the initial interest expressed in community meetings. In addition, defendant argues that everyone involved expected that the figures would be adjusted based on actual enrollment and understood that the state would seek reimbursement for any overpayments. The implication of this argument seems to be that Olds could not have had the requisite intent when he expected state oversight would correct the enrollment figures and require reimbursement for the overpayments. That an adjustment was anticipated, however, does not negate the unrebutted evidence that CAMST continued to materially misrepresent the actual enrollment figures, which resulted in overpayments of more than $1.3 million to CAMST to operate a school for a year and a half that never had more than 135 students. Indeed, Haynes admitted to falsely overstating the monthly electronic reports and testified

---

[4]The jury was also instructed that it could convict Olds of mail fraud, as an aider and abettor, if the government proved that the crime of mail fraud was committed, that the defendant helped commit or encouraged another to commit the crime, and that the defendant intended to help or encourage the crime.

that: she gave Olds the password to the reporting system; she told Olds about the overpayments; and she issued checks to New Opportunity and others at Olds's direction.

Without contradicting Haynes, defendant attempts to deflect blame by pointing out that it was Haynes who was responsible for both reporting student enrollment and accounting as treasurer for the money received from the state. There was sufficient evidence to support a finding that Olds knew the enrollment was being materially misrepresented, that Olds understood this to mean substantial overpayments were flowing into CAMST as a result, and that Olds made financial decisions that syphoned the overpayments away from CAMST. Keeping in mind that we may not assess the credibility of witnesses in evaluating the sufficiency of the evidence, we find that the evidence was more than sufficient to lead a rational trier of fact to conclude that Olds acted with the necessary intent to defraud the State of Ohio. *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003).[5]

The money laundering counts, which required proof that mail fraud was committed, alleged that Olds and New Opportunity, or Olds and MCO Media, knowingly engaged or attempted to engage in monetary transactions affecting interstate commerce involving property that was valued at more than $10,000 and was derived from the mail fraud scheme. The monetary transactions—each of which involved more than $10,000—were the bank deposits consisting of twenty-five payments from CAMST to New Opportunity and fourteen

---

[5]Olds states, without further amplification, that there was no evidence that he used or understood that the mails would be used to defraud the State of Ohio. First, Haynes testified that Olds collected at least one of the warrants sent through the mail. Second, it is not necessary for the government to prove that the defendant actually used the mails, only "that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen the use of the mails." *Frost*, 125 F.3d at 354.

payments from New Opportunity to MCO Media. In appealing these thirty-nine convictions, defendant essentially argues that because there was insufficient evidence to establish mail fraud, the deposits did not involve property that was criminally derived. Having concluded that the evidence was sufficient to prove mail fraud, we also find there was sufficient evidence to lead a rational trier of fact to conclude that the monetary transactions involved property derived from the mail fraud scheme.

## B.    Prior Felony Conviction

Seeking a new trial, defendant argues that the district court abused its discretion in allowing two witnesses to testify that defendant was told during the approval process that he could not be on the development team because he had a prior felony conviction. We generally review a district court's decision to admit or exclude evidence for abuse of discretion. *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).

Defendant argues that this evidence was improperly admitted under Fed. R. Evid. 404(b), which provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is clear, however, that the evidence was not admitted on that basis. As the district court's pretrial order explained:

> the Court concludes that the government may introduce evidence of the prior felony convictions under principles of *res gestae*. Introduction of the *fact* of conviction is necessary to properly portray the relationship between the various entities and the school, as well as the reason why certain entities were formed

in the first place. The government, however, correctly concedes that the nature of the convictions, the sentences received or the facts supporting the charges are inadmissible. Although the government may introduce the fact of conviction for purposes of its case-in-chief, the government may not cross-examine Mr. Olds regarding the convictions for purposes of impeachment. The convictions are greater than ten years old and the government fails to demonstrate exceptional circumstances sufficient to warrant admission of the evidence.

Consistent with this ruling, two witnesses briefly testified that defendant was told after the initial approval that he could not continue to be on the development team or on the school's board because he had a prior felony conviction. This was the only evidence admitted concerning the defendant's prior convictions.

This court has recognized an exception to the strictures of Rule 404(b) for *res gestae* or "background" evidence. *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). To come within this exception, the evidence must "consis[t] of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *Id*. That is:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*Id*. Defendant contends that the fact that he was a convicted felon was merely a collateral fact that had no connection with the charged offense. The government argued, however, that the fact of defendant's prior conviction provided the explanation for why Olds went from being a developer and potential board member to running the school under a management contract with New Opportunity instead. This was relevant to the government's theory that

Olds used New Opportunity to control the school's finances and further the mail fraud scheme. The district court did not abuse its discretion in concluding that this limited evidence constituted background evidence that did not implicate the strictures of Rule 404(b).

Nonetheless, cognizant of the potential for prejudice, the district court excluded evidence concerning the nature and circumstances of defendant's prior criminal history and precluded the government from using defendant's prior convictions for purposes of impeachment. As a result, testimony that defendant had an unspecified prior felony conviction came in on a specific point. This minimized the risk that the jury might use the information for an improper purpose such as concluding that the defendant is a "bad person" or that if he "did it before, he probably did it again." The district court also provided further guidance to the jury in a limiting instruction given as part of the jury charge. The limiting instruction advised the jury that the fact that defendant had a prior felony conviction was admitted to show the background circumstances surrounding the creation of New Opportunity and MCO Media, then admonished the jury that this fact could not be used as evidence that defendant was a bad person or was likely to commit a crime. It was not an abuse of discretion to conclude that the probative value of this evidence, as limited, was not substantially outweighed by its potential for unfair prejudice. FED. R. EVID. 403.

Finally, errors in the admission of evidence are subject to harmless-error review. *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006). In determining whether an error was harmless, this court must consider what the error meant to the jury, not standing alone,

but in relation to the trial as a whole. *Id*. An error is not harmless if it is more probable than

not that the error materially affected the verdict. *Id*. Here, although defendant argued that

he lacked the intent to defraud the State of Ohio, there was ample evidence from which the

jury could infer the necessary intent. We cannot conclude that admission of evidence that

defendant had a prior felony conviction materially affected the verdicts in this case.

**C.     Sentencing**

Sentences imposed post-*Booker* are reviewed for procedural and substantive

reasonableness. *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *United States v. Booker*,

543 U.S. 220, 261 (2005). A sentence may be procedurally unreasonable if, among other

things, the district court improperly calculated the sentencing guidelines range, treated the

guidelines as mandatory, or failed to consider relevant sentencing factors under 18 U.S.C.

§ 3553(a). *Gall*, 128 S. Ct. at 597. If procedurally sound, a challenge to the substantive

reasonableness of a sentence is reviewed for abuse of discretion. *Id*. at 598.

In calculating the offense level under USSG § 2S1.1, the district court grouped the

mail fraud and money laundering convictions and, based on an underlying offense of mail

fraud and a loss of between $1 and $2.5 million, found the total offense level to be 24. The

district court rejected not only the defendant's request for a reduction for acceptance of

responsibility, but also the government's requests for upward adjustments for defendant's

role in the offense and abuse of trust. Since the tax offenses had a lower offense level, the

multiple-count adjustment was added to the first group for a total offense level of 26.

Counting three prior convictions for armed bank robbery, for a criminal history score of 9

(category IV), the district court determined the guidelines range to be a term of 92 to 115 months' imprisonment.[6]   After denying defendant's request for downward departure, considering the relevant sentencing factors under 18 U.S.C. § 3553(a), and refusing to grant a downward variance, the district court imposed concurrent sentences for a total term of imprisonment of 92 months.

### 1.       Procedural Reasonableness

Defendant argues first that the district court erred in calculating the guidelines range by denying him a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a). We review for clear error the district court's determination whether to award such a reduction.  *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006).   Although proceeding to trial does not automatically preclude the district court from considering this reduction, it is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  USSG § 3E1.1, cmt. n.2; *see also United States v. Angel*, 355 F.3d 462, 477 (6th Cir. 2004).

In support of this argument, defendant states that he "implicitly" accepted responsibility and liability for the overpayments by virtue of his efforts before trial to obtain funds to reimburse the State of Ohio.  Defendant suggests that this makes his situation analogous to *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir. 1990), in which this court rejected the government's appeal from a decision to award the two-level reduction.  While

---

[6]No criminal history points were assessed for several other prior convictions, including for manslaughter, robbery, and unlawful restraint, because they were too old.  USSG § 4A1.2(e).

Fleener had asserted a defense of entrapment at trial, the sentencing judge found that the defendant had demonstrated affirmative acceptance of personal responsibility for the offense by providing voluntary assistance to law enforcement in the recovery of the fruits and instrumentalities of the offense. The defendant's apparently unsuccessful efforts to secure reimbursement for the overpayments do not make this case comparable to *Fleener*. Given that the defendant denied the essential factual elements of guilt, put the government to its proofs, and then failed to accept personal responsibility for the offenses when given the opportunity to speak to the issue at sentencing, the district court did not clearly err in determining that the defendant should not receive the reduction for acceptance of responsibility.

Defendant also argues that the district court erred in denying his request for a downward departure from the guidelines for any one of several reasons. It is clear from a review of the sentencing transcript, however, that the district court was aware of its discretion to depart downward and decided against it. As a result, the denial of the request for downward departure is unreviewable on appeal. *United States v. Madden*, 515 F.3d 601, 613 (6th Cir. 2008).

### 2.    Substantive Reasonableness

The advisory guidelines range provides the starting point and initial benchmark for substantive-reasonableness review. *Gall*, 128 S. Ct. at 596. The sentencing judge may not presume that the guidelines range is reasonable, but must consider all of the relevant § 3553(a) factors and impose a sentence that is "sufficient, but not greater than necessary" to

satisfy the purposes of § 3553(a)(2). A sentence imposed within a properly calculated guidelines range will be afforded a rebuttable presumption of reasonableness on appeal. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir.), *cert. denied*, 129 S. Ct. 68 (2008).

Defendant argues that his sentence was disparate when compared to the culpability and punishment of others involved in this case. Section 3553(a)(6) identifies as one of the factors to be considered "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." As this suggests, § 3553(a)(6) does not require the district court to compare the sentence to individuals like Daniels who were not convicted of similar conduct. Moreover, although Haynes stood to receive a much lower sentence, disparities between codefendants can exist for valid reasons, including, as in this case, differences in criminal histories and the decision of one to plead guilty and cooperate with the government. *United States v. Dexta*, 470 F.3d 612, 616 n.1 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3066 (2007); *United States v. Nelson*, 918 F.2d 1268, 1275 (6th Cir. 1990); *see also Gall*, 128 S. Ct. at 599 (noting that because the guidelines take into consideration the need to avoid unwarranted disparities, consideration of the advisory guidelines range necessarily entailed consideration of the need to avoid unwarranted disparities).

Next, although defendant suggests that the district court failed to consider his "exceptional charitable and community activities" and his "good works" as a minister and community leader, defendant's argument is in essence that his sentence was substantively unreasonable because these facts should have been given more weight. These matters were

before the district court through the defendant's sentencing memorandum, the letters and other expressions of support for defendant, and the defendant's own allocution. The record reflects that the district court consulted the guidelines, considered the other § 3553(a) factors, noted the defendant's criminal history—including the very serious nature of the offenses of conviction—and considered defendant's arguments regarding his request for a variance, his "good works," his good intentions in the past, and his age at the time of sentencing. The district court concluded that a sentence at the lowest end of the advisory guidelines range satisfied the purposes of sentencing, provided just punishment, would protect the public, and afforded adequate deterrence. Defendant has neither rebutted the presumption on appeal that the within-guidelines sentence was reasonable, nor demonstrated an abuse of discretion in the weighing of the relevant sentencing factors.

**AFFIRMED**.