**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0201n.06

Nos. 08-4215/08-4564

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Apr 01, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| RANDOLPH H. SPEER, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | **OPINION** |
| | ) | |

**BEFORE: GIBBONS and WHITE, Circuit Judges, and MALONEY,** * **District Judge.**

**HELENE N. WHITE, Circuit Judge.** Defendant Randolph H. Speer was convicted of one

count of conspiracy to commit securities and wire fraud, 18 U.S.C. § 371, three counts of securities

fraud, 15 U.S.C. §§ 77q(a) & 77x& 2, one count of wire fraud, 18 U.S.C. §§ 1343 & 2, one count

of conspiracy to commit money laundering, 18 U.S.C. § 1956, and five counts of concealment money

laundering, 18 U.S.C. § 1956(a)(1)(B)(i). Speer appeals his convictions and sentence. We affirm

in part and reverse in part.

**I.**

_____

*The Honorable Paul L. Maloney, Chief Judge of the United States District Court for the
Western District of Michigan, sitting by designation.

The facts surrounding this case are described in detail in *United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010), an appeal by one of Speer's co-defendants. We include them here only as necessary to review Speer's arguments.

National Century Financial Enterprises (NCFE) purchased healthcare providers' accounts receivable at a discount and pooled those receivables to secure bonds that it sold to institutional investors to raise capital for the purchase of the receivables. NCFE also collected program fees from the healthcare providers. The investors earned interest and were repaid through collections on the receivables. Providers, meanwhile, were paid almost immediately for services, rather than having to wait for insurers to process and pay claims. This business model was, in theory, a sound one.

NCFE operated primarily through two subsidiaries, NPF VI and NPF XII. These entities issued the actual bonds. Another NCFE subsidiary, National Premier Financial Services (NPFS), was responsible for performing the day-to-day services necessary to purchase the receivables, administer the accounts, and manage the collection of the receivables. A Master Indenture Agreement detailed the legal obligations among the bond issuers, NPFS, and the banks that served as trustees of the NPF programs' accounts. NPFS was responsible for determining which receivables were eligible for purchase and the trustee banks were required to monitor the programs on behalf of the bond-holders. The notes issued to bond-holders contained written terms that restricted the use of the funds invested to the purchase of eligible receivables. The notes also detailed credit

enhancements, including overcollateralization, credit reserves, and other means of ensuring that the principal owed on the notes would be secure.[1]

Although its business model was outwardly strong, the actual practices of NCFE varied drastically from what investors were promised. Rather than being used only to fund the purchase of eligible receivables, much of the funding brought in from the sale of bonds was used to advance money to healthcare providers without the purchase of receivables. Several of these providers had no realistic ability to repay the advances and lacked adequate receivables to support the amounts advanced. The improper advances, some of which were made to companies in which NCFE principals held ownership stakes, severely depleted the cash reserves that NPF VI and NPF XII were required to maintain to protect bond-holders. To cover the losses, NCFE issued more notes. NCFE executives also falsified data presented to investors. Additionally, NCFE moved funds between various accounts within and across NPF VI and NPF XII to meet minimum funding requirements on reporting dates. The reporting dates for the two programs were staggered so that the same funds could be counted separately by each program to meet investor requirements.

---

[1]First, NCFE executives represented that investors' funds would only be used to purchase "eligible receivables," or receivables meeting certain criteria for a low risk of default. Second, the receivables would serve as collateral for the amounts that NCFE owed its bond-holders. Every time NCFE sent investors' funds to a provider, the investors would obtain roughly equivalent collateral in the form of purchased receivables. Third, NCFE executives told investors that it would maintain reserve accounts equal to 17% of the "outstanding Purchase Receivables"; in the event that the purchased receivables were not paid, NCFE could then withdraw the unpaid amount from the reserve accounts. Fourth, NCFE indicated that the accounts containing investors' funds would have trustee oversight.

Eventually, the scheme became unsustainable. At the end of September 2002, one of the trustee banks blocked a transfer between NPF VI and NPF XII, triggering an event of default. In November 2002, NCFE filed for bankruptcy, resulting in investor losses of approximately $2.4 billion. On November 12, 2002, the FBI raided NCFE's headquarters, seizing its files and documents. The ensuing investigation revealed substantial financial irregularities.

In 2006, the government secured indictments against seven of NCFE's executives on charges of conspiracy, securities fraud, wire fraud, mail fraud, and money laundering.[2] Five of the seven executives, including Speer, were jointly tried. After a six-week trial and two days of deliberation, Speer was convicted of one count of conspiracy to commit securities and wire fraud, three counts of securities fraud, one count of wire fraud, one count of conspiracy to commit money laundering, and five counts of concealment money laundering. Speer moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the government's case-in-chief and again at the close of trial. The district court denied both motions, as well as Speer's renewed motion made following his convictions, stating:

> The trial in this case lasted for six weeks. The twenty-two volume trial transcript shows that Defendants had considerable opportunities to, and in fact did, attack the Government's evidence against them by putting on their own defenses and by extensively cross-examining the Government's witnesses and challenging its documentary evidence. The record also shows that the evidence against Defendants was substantial. Six former National Century employees testified and three of these—Jon Beacham, Sherry Gibson, and Jessica Bily—were senior executives with intimate knowledge of the company's operations and how it perpetrated investor fraud. Each of these executives admitted to engaging in criminal conduct and they all implicated Defendants in the criminal conspiracy. Besides National Century

---

[2]Three other former executives cooperated with the government and pleaded guilty.

insiders, the Government put on witness testimony from the investors whose money, unbeknownst to them, was improperly used to make unsecured loans to healthcare providers. The Government also called to the stand representatives of the healthcare providers, who confirmed that they asked for, and received, hundreds of millions of dollars in National Century loans that the providers had little ability to pay back.

Speer appeals, claiming that the evidence was insufficient to support his convictions and the district court erred in denying his motion to suppress evidence seized during the warrant-authorized search of NCFE's headquarters.[3]

## II.

Speer claims that the district court erred when it denied his motion for acquittal based on insufficient evidence. We review de novo a district court's denial of a motion for acquittal challenging the sufficiency of the evidence. *United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008). In reviewing challenges regarding the sufficiency of the evidence . . . , we are limited to ascertaining whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000) (citations and internal quotations omitted). We "must view all evidence and resolve all reasonable inferences in favor of the government." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so, however, we do not independently weigh the evidence or substitute our judgment for that of the jury. *Id.* Thus, "[a]

---

[3]In addition to advancing his own arguments in an attempt to invalidate his convictions, Speer adopts three arguments previously put forth by his co-defendants, Donald Ayers and Roger Faulkenberry. Speer does not add any new evidence or analysis to buttress these arguments. As this court has already examined and rejected these arguments on the merits in *United States v. Ayers*, 386 F. App'x 558 (6th Cir. 2010), and *Faulkenberry*, 614 F.3d 573, we reject them here as well.

defendant bringing such a challenge bears a 'very heavy burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citations omitted).

**A.**

Speer first challenges his conviction of conspiracy to commit securities and wire fraud in violation of 18 U.S.C. § 371. The government must show three elements to prove a conspiracy: "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *Hughes*, 505 F.3d at 593. "A tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement[, and a] conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *Id.* (citations omitted); *see also United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008) ("No proof of a formal agreement is required to establish a conspiracy to violate federal law; 'a tacit or mutual understanding among the parties will suffice.'. . . Just as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence.") (citations omitted).

Speer challenges his conspiracy conviction, asserting that there is a lack of evidence relating both to his direct involvement in misleading investors and his knowledge that advances were improper. Speer points to specific portions of testimony that support his position, such as the testimony of Amy Boothe-Fuentes of Alliance Capital, a representative investor, that investors' decisions were based upon their due diligence, representations made by Credit Suisse First Boston,

and ratings-agency opinions, and the testimony of Jessica Bily, an NCFE executive, that once a wire transfer was authorized by one of the principals of NCFE, it would have to be completed regardless of whether anyone questioned it.

This evidence could, indeed, be viewed as supporting Speer's innocence. However, in reviewing for sufficiency of the evidence, we are required to view the evidence in the light most favorable to the prosecution and "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Sliwo*, 620 F.3d 630, 640 (6th Cir. 2010) (citations and internal quotations omitted). Thus, the evidence Speer relies on must be viewed in the context of all the evidence and in the light most favorable to the government.

Speer was the Chief Financial Officer (CFO) and executive vice president of finance at NCFE. Sherry Gibson, another NCFE executive, testified that Speer was one of the "most knowledgeable people about advancing money . . . without purchasing accounts receivable." Before joining NCFE, Speer had been the Chief Executive Officer (CEO) of RX Medical, a healthcare company that received funding from NCFE. Testimony showed that while working at NCFE, Speer authorized approximately 400 advances from NPF VI and NPF XII, including advances to his former employer, RX Medical, and an affiliated company, Consolidated Health Corporation (CHC). Speer also participated in executive-committee meetings at which NCFE's senior management discussed the effects of the practice of advancing funds on the investment programs, as well as compliance issues and the investor reports. Bily also testified that she discussed her concerns about NCFE's practice of advancing funds with Speer, and Speer "acknowledged that there were problems."

Additionally, Gibson testified that she had to falsify the monthly investor reports so that the reports would comply with program requirements, and that she discussed with Speer "what [she] had to do" with the investor reports. Speer also received a "confidential" copy of a report comparing information in the NCFE investor reports with the information that should have been included in these reports but was not.

Bily testified that Speer met with her and Gibson to discuss problems with end-of-month reporting and "what to do to cover the shortages" with respect to moving funds around between the programs to satisfy monthly reporting requirements. Speer was also copied on memos detailing the shortages in the reserve accounts and the transfer of funds between NPF VI and NPF XII. According to Bily, Speer had been copied on other significant memos, including one describing NCFE's "special funding arrangements" with certain healthcare providers.

Combined with proof of the fraud at NCFE, this testimony provides sufficient evidence for a rational trier of fact to conclude that Speer knowingly participated in the conspiracy to commit the fraud.

**B.**

Speer next challenges his conviction of wire fraud in violation of 18 U.S.C. § 1343. The wire-fraud charge was based on Speer's authorization of a $300,000 advance from NPF XII to Home Care Concepts of America (HCCA), a healthcare company owned by NCFE's principals.

Section 1343 states, in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,

radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

This statute requires proof of three elements. The first is that "the defendant devised or willfully participated in a scheme to defraud.[4] The second is that he used or caused to be used an interstate wire communication 'in furtherance of the scheme'; and the third, that he intended to deprive a victim of money or property.'" *Faulkenberry*, 614 F.3d at 581 (quoting *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000)).

Speer argues that the government failed to prove that he had the intent to defraud anyone, that he executed the wire transfer "in conformity with decisions made by [NCFE's] principals/owners," and that the wire-transfer offense is a mere mechanism "by which the alleged securities fraud was alleged to have been committed."[5] His arguments are unavailing, however.

Based on the evidence described above, the jury had ample reason to conclude that Speer willfully participated in the fraud. Speer's job responsibilities "placed him in close proximity to the fraud," *Faulkenberry*, 614 F.3d at 581; several witnesses testified that Speer knew about the fraud; and numerous documents supported this testimony. Further, Speer initiated the wire transfer that advanced $300,000 to HCCA and was identified as the person who had authorized the advance on

---

[4]"The statute's terms suggest that [the defendant] must have 'devised' [the scheme to defraud], but all of the circuits to have decided the issue agree that willful participation is enough." *Faulkenberry*, 614 F.3d at 581.

[5] The case Speer cites in support of this proposition, *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002), deals with the issue of how the term "proceeds" should properly be defined under the money-laundering statute and therefore does not aid Speer's argument regarding the propriety of his wire-fraud conviction.

the wire-transfer request form.  An interoffice memorandum discussing advances from NPF VI and

NPF XII identified Speer as being one of only three NCFE executives who could authorize the

release of *any* wire to *any* healthcare provider, belying Speer's contention that he was merely acting

at the behest of NCFE's principals. The wire transfer furthered NCFE's scheme of providing funds

to healthcare providers without obtaining any receivables in return, and the evidence overwhelmingly

demonstrates that, through his participation in the scheme, Speer intended to deprive a victim of

money or property.  Thus, a rational trier of fact could have determined that the government's

evidence was credible and found that the advance constituted wire fraud.

## C.

Speer also challenges his conviction of three counts of securities fraud.  To prove securities

fraud under 15 U.S.C. § 77q(a), the government must show the offer or sale of a security through

instruments of interstate commerce and fraud in connection with the offer or sale. 15 U.S.C. §

77q(a); *see also United States v. Dowlin*, 408 F.3d 647 (10th Cir. 2005).  The statute specifies three

forms of fraudulent conduct:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact
> or any omission to state a material fact necessary in order to make the statements
> made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or
> would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §77q(a)(1)-(3).

Speer was convicted of three counts of securities fraud relating to notes issued by NPF VI

and NPF XII in 2001-2002.  Speer maintains that there was no evidence that he made false

statements or misrepresentations to investors or that any investor relied on his communications in making investment decisions. He further contends that his signing of incumbency certificates[6] for NPF VI and NPF XII in connection with note offerings was purely ministerial. Finally, Speer claims that because the "fraud was the product of a very clandestine scheme known only to a select number of individuals," and Speer was not one of these individuals, the evidence fails to support his convictions.

A reasonable jury could find that Speer had committed securities fraud. Gibson testified that none of the NPF VI and NPF XII investor reports were accurate, that the information from the inaccurate investor reports was incorporated into private placement memoranda that were made available to investors, and that the information provided to investors in presentations was consistent with the private placement memoranda. Gibson and Bily both testified that they informed Speer about the falsification of the investor reports. Further, Jon Beacham, NCFE's director of securitization, testified that Speer spoke at a number of investor presentations and discussed NCFE's financial review processes. Beacham also stated that all of the NCFE executives who participated in the investor presentations knew of NCFE's practice of making advances that were not backed by receivables but did not reveal this information to investors.

---

[6]The certificate states that the company validly exists under Ohio law, that it is in good standing according to Ohio law, that a correct copy of the company's Code of Regulations is attached, and that a correct copy of the resolution authorizing the notes is attached.

The incumbency certificate itself does not make any statement about the validity of the claims made in the note documents. Rather, it states that certain administrative requirements have been met. Beacham stated that the only significance of an incumbency certificate is that "it tells you who is authorized to sign on behalf of [the company] to have [the] transaction executed and issued."

The fact that funds were repeatedly advanced to providers without sufficient receivables could reasonably be seen as a material omission, as one of the most significant selling points of the notes was their secure nature. Moreover, evidence that Speer both knew of and approved improper advances, as well as testimony that the notes were issued to cover up the reserve shortfalls created by the advances, could support a rational trier of fact's conclusion that, when he signed the incumbency certificates accompanying the note offerings on October 2001, November 2001, and February 2002, Speer knew that the note offerings contained material omissions and false representations.

Although it is doubtful that Speer's signing of the incumbency certificates creates criminal liability, there is ample evidence that Speer took part in a variety of actions during which he knowingly made material misrepresentations and omissions in order to further sales of NCFE's securities. Thus, the statutory requirements of § 77q(a)—that there was an offer or sale of a security through instruments of interstate commerce and fraud (including obtaining money or property by means of any untrue statement or material omission) in connection with the offer or sale—are satisfied. Additionally, Speer was charged not only with primary violations of the securities-fraud statutes, but also with aiding and abetting such violations, which allows for punishment as a principal. *See* 18 U.S.C. § 2. Speer's securities-fraud convictions can be upheld on this ground if some other party had committed a securities-law violation, and if Speer " had general awareness that his role was part of an overall activity that [was] improper, and if [he] knowingly and substantially assisted the violation." *S.E.C. v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974). Here, at least one NCFE principal committed securities fraud in authorizing the bond issuances, and a rational trier of

fact could have found that Speer knew that his role in signing the certificates was part of an overall fraudulent scheme. It is also undisputed that the bonds could not have been issued (and the three instances of securities fraud would not have occurred) without the signed incumbency certificates.

**D.**

Finally, Speer challenges his convictions of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956, and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Three of the five § 1956(a)(1)(B)(i) charges were based on June 5, 2001, wire transfers of funds from NPF VI that were to be used "to satisfy a lawsuit settlement obligation of an entity owned by [Lance] Poulsen," one of the other defendants, and the other principals of NCFE. The other two § 1956(a)(1)(B)(i) charges were based on a wire transfer of $1.6 million from NPF VI to Home Medical of America (HMA) on July 20, 2001, and on a second wire transfer that same day for $1.3 million from HMA to Intercontinental Investment Associates (IAA), a "holding company" owned by the principals of NCFE.

Section 1956(a)(1)(B)(i) makes it a crime to engage in a financial transaction involving proceeds from specified unlawful activity "knowing that the transaction is designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." The Supreme Court recently interpreted the money-laundering statute, holding that the word "designed" requires proof of a purpose. *See Cuellar v. United States*, 553 U.S. 550, 563-64 (2008) ("[W]hen an act is 'designed to' do something, the most natural reading is that it has that something as its purpose."). *Cuellar* involved an appeal of a conviction under § 1956(a)(2)(B)(i), which contains language almost identical to § 1956(a)(1)(B)(i), except that it relates specifically to transporting

funds internationally. The defendant had been caught trying to transport drug trafficking proceeds, which he had hidden in a secret compartment under his car's rear floorboards, into Mexico. *See id.* at 553-54. The Court held that it was insufficient to show that the funds had been disguised while being transported; rather, it was necessary to show that the transportation was aimed at disguising a listed attribute[7] of the funds. *See id.* at 563-64. Because the government had only introduced evidence that the money was hidden to facilitate its movement to Mexico, *id.* at 567 n.7, the Court overturned the defendant's money-laundering conviction, *id.* at 568.

Speer argues that the evidence is insufficient to support his money-laundering convictions because there was no evidence of a separate and distinct concealment and there was no evidence of transactions involving illegal profits. Speer relies on this court's decisions in *Ayers* and *Faulkenberry*.

In *Ayers* and *Faulkenberry*, we applied *Cuellar* in overturning the money-laundering convictions of Ayers and Faulkenberry, two NCFE principals. The convictions were based on wire transfers authorized by Ayers and Faulkenberry, which were accompanied by falsified receivables purchase reports and promissory notes stating that NCFE's own money, rather than investor monies, would fund the transaction. We held that the government failed to prove that these transfers were "designed in whole or in part . . . to conceal or disguise" the nature or source of the fraudulently obtained funds, *Faulkenberry*, 614 F.3d at 585, because it did not show that "concealment was one

---

[7]"Listed attribute" refers to the nature, the location, the source, the ownership, or the control of the proceeds. *Cuellar*, 553 U.S. at 559.

of the purposes that drove [Ayers and Faulkenberry] to engage in the transaction[s] in the first place," *id.* at 586.

The government makes no attempt to distinguish these cases. Indeed, the government acknowledged in its briefs and at oral argument that its "theory at trial . . . was the same as on the counts the Court reversed in *Faulkenberry*. Accordingly, Speer's convictions on Counts 17-22 should be reversed, and the case should be remanded for resentencing on the remaining counts." We therefore reverse Speer's money-laundering convictions.

### III.

Speer also argues that the district court erred in denying his motion to suppress evidence, contending that he had established his right to a *Franks v. Delaware*, 438 U.S. 154 (1978), hearing, that the warrant issued for the search of NCFE was impermissibly broad and lacked specificity, and that the warrant lacked probable cause.

When reviewing decisions on motions to suppress, we will uphold the factual findings of the district court unless they are clearly erroneous while reviewing legal conclusions de novo. *United States v. Johnson*, 627 F.3d 578, 583 (6th Cir. 2010). We extend "great deference to a previous finding of probable cause for the issuance of the search warrant. Thus, it is this [c]ourt's task to determine whether, in light of the totality of the circumstances, the judge issuing the warrant had a substantial basis for concluding that a search of the specified premises would uncover evidence of wrongdoing." *United States v. Logan*, 250 F.3d 350, 364 (6th Cir. 2001) (citations omitted).

In determining whether "a search warrant describes the place to be searched with sufficient particularity," we employ de novo review. *United States v. Miggins*, 302 F.3d 384, 393 (6th Cir.

2002) (citations omitted). We review a district court's "denial of a *Franks* hearing under the same standard as for the denial of a motion to suppress: the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo." *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (citations omitted).

Speer first contends that he was entitled to a *Franks* hearing. A defendant is entitled to a hearing to challenge the validity of a search warrant if he makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. If, at the evidentiary hearing, the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search" must be suppressed. *Id*. at 156.

The term "false statement" also includes a material omission for purposes of *Franks*, but we have "repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008). "Allegations of material omission are held to a higher standard because of the 'potential for endless rounds of *Franks* hearings' due to potentially 'endless conjecture about investigative leads, fragments of information, or other matter[s] that might, if included, have redounded to defendant's benefit.'" *Id.* at 415-16 (citations omitted).

Speer based his request for a *Franks* hearing on the following allegedly material omissions: (1) the documents governing NCFE's securities, including the Master Indentures and the Sales and Subservicing Agreements, permitted the business activities complained of; (2) the data on NCFE's AS400 computer system belied the contention that NCFE falsely told investors that it had accounts receivable assets that it did not actually have; (3) advancing funding to healthcare providers without getting any accounts receivable immediately in return was a common practice within the healthcare securitization industry and was authorized by NCFE's securities documents; and (4) the trustees of NCFE's NPF VI and NPF XII securities portfolios had regularly signed off on transfers between the two accounts so that NCFE would satisfy minimum asset balances on certain "test" dates.

The district court observed that although Speer identified these alleged omissions, he did not make any showing that FBI Special Agent Matthew J. Daly, whose eight-page affidavit accompanied the application for the warrant, acted with the requisite state of mind—that he "knowingly and intentionally, or with reckless disregard for the truth," omitted these facts in order to mislead the magistrate judge. *Franks*, 438 U.S. at 155. Additionally, the district court found that Speer offered no proof in support of his allegations, contravening the requirement set out in *Franks*. *See id.* at 171 ("[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable

statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations

of negligence or innocent mistake are insufficient.").

In light of the high bar for obtaining a *Franks* hearing on the basis of an allegedly material

omission, and the fact that Speer did not even attempt to satisfy *Franks*'s "substantial preliminary

showing" standard, *id.* at 155, the district court did not err in denying Speer's request for a *Franks*

hearing.

Speer also argues that the warrant issued for the search of NCFE was impermissibly broad

and lacked specificity.  The Fourth Amendment requires a warrant to "particularly describ[e] the

place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV. This

particularity requirement is designed to prevent the use of general warrants authorizing searches in

violation of the Constitution's proscription against unreasonable searches and seizures.  *See*

*Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th

Cir. 1994); *see also United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (holding that a

"warrant must enable a searcher to reasonably ascertain and identify the things which are authorized

to be seized") (citations and internal quotations omitted).

We have recognized that the issue of whether a warrant lacks the requisite particularity "is

best resolved upon examination of the circumstances of the particular case." *Logan*, 250 F.3d at 365;

*see also United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000) (stating that "the degree of

specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime

involved").  In *Logan,* we upheld the lower court's determination that a search warrant authorizing

"agents of the government to search for and seize any records, files, and documents relating to the

mobile home loans made by LLFC co-insured by HUD/FHA and upon which LLFC issued

mortgage-backed securities pursuant to GNMA" satisfied the particularity requirement. *Logan*, 250

F.3d at 363. We reasoned that where fraudulent activity allegedly permeates an entire organization,

"law enforcement officials [are] necessarily involved in an examination of an extensive paper trail

in order to discover which transactions may have been illegal in nature." *Id.* at 365.

NCFE was suspected of financial fraud, perpetrated on an organization-wide basis. As we

have held, in cases of company-wide financial fraud, search warrants necessarily must authorize

broad seizures of corporate records. *See id*. Thus, the warrant in this case which, like the warrant

in *Logan*, authorized the seizure of "any and all records or information . . . relating to . . . account

receivables; sellers of account receivables; investors; note holders; banking records; wire transfer

records; and reports to investors, note holders or indenture trustees," satisfies the Fourth

Amendment's particularity requirement.

Finally, Speer argues that the search warrant lacked probable cause. Because the Magistrate

Judge found that probable cause supported the issuance of the warrant, we must "determine whether,

in light of the totality of the circumstances, the judge issuing the warrant had a substantial basis for

concluding that a search of the specified premises would uncover evidence of wrongdoing." *Id.* at

364. Two elements "are often critical in determining whether a confidential informant's tip provides

such a 'substantial basis.'" *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994). First, even

if the informant's motives are questionable, an "explicit and detailed description of alleged

wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's]

tip to greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983).

Particularly when an affidavit is detailed, there is no requirement that an informant have a history of reliability. *See Sonagere*, 30 F.3d at 54. Second, the extent to which the tip is corroborated by a police officer's own investigation is significant. *See Gates*, 462 U.S. at 243-44.

In this case, as described in the affidavit accompanying the application for the search warrant, Special Agent Daly interviewed four sources, who provided highly detailed descriptions of NCFE's allegedly fraudulent activities based on their personal knowledge and first-hand observations. At least two of the sources had reviewed documents and records at NCFE's headquarters. These sources' statements were consistent with one another in all relevant respects. Special Agent Jack Vander Stoep independently corroborated some of the information provided by at least one of the sources. In light of the totality of these circumstances, the Magistrate Judge issuing the warrant had a substantial basis for concluding that a search of NCFE's premises would uncover evidence of wrongdoing.

## VI.

Based on the foregoing, we **REVERSE** Speer's money-laundering convictions, **AFFIRM** Speer's remaining convictions, and remand the case for resentencing.