NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0646n.06

Nos. 14-5721/5722

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| JOSHUA DOBSON and PAUL GOTT, III, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**FILED**
Sep 16, 2015
DEBORAH S. HUNT, Clerk

BEFORE: BOGGS and DONALD, Circuit Judges; and QUIST, District Judge.[*]

QUIST, District Judge. Defendants, Joshua Dobson and Paul Gott III, appeal their convictions and sentences for one count of conspiracy to commit wire fraud and money laundering, in violation of 18 U.S.C. §§ 371, 1343, and 1957; three counts of wire fraud, in violation of 18 U.S.C. § 1343; and two counts of money laundering, in violation of 18 U.S.C. § 1957. Defendants' convictions arise out of a mortgage-fraud scheme in which Defendants made the down payments for purchasers of properties without disclosing such fact to the lenders. Defendants used so-called "gift letters" in some of these transactions to disguise the down payments they made for purchasers. The district court sentenced Dobson to 126 months of imprisonment and five years of supervised release and Gott to 75 months of imprisonment and five years of supervised release, and ordered restitution. On appeal, Defendants argue that their constitutional rights were violated when Gott's counsel inadvertently disclosed a privileged

---

[*] Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

communication to the government and the district court failed to remove the prosecutors and agents who viewed the privileged materials from the case. Dobson also challenges the sufficiency of the evidence of his intent to defraud the lending institutions. Finally, Defendants challenge their sentences. Dobson contends that the district court erred in considering acquitted and uncharged conduct, and Gott contends that the district court failed to properly calculate the loss.

We affirm.

## I.

### A. The Fraudulent Scheme

Southern Group, LLC and its various subsidiaries (collectively, Southern) developed and sold real estate, including lots in a development known as "The Preserve," located in Rising Fawn, Georgia. Dobson was a principal of Southern and was in charge of sales and marketing of the properties. Gott was an independent contractor of Southern who was responsible for facilitating mortgage loans for the real estate transactions.

As early as 2007, Southern, through Dobson, offered lots for sale with a "no-money-down" financing program, through which Southern would make the down payments and the first three years of mortgage payments for purchasers with good credit. Southern did not disclose to the lenders in these transactions that it provided the down payments to the purchasers or that it was making the mortgage payments.

Beginning in approximately 2009, Southern began to use "gift letters" as part of its financing scheme. In these transactions, a third person signed a "gift letter," which falsely stated that the third person was related to the purchaser and was gifting funds to the purchaser to use as

a down payment. Southern provided the down payment funds to the third person, who in turn provided them to the purchaser for the down payment at closing.

On May 1, 2012, Dobson and Gott were charged with conspiracy to commit wire fraud and money laundering, seven counts of wire fraud, and four counts of money laundering. The conspiracy count alleged that Dobson and Gott engaged in a scheme to defraud the mortgage lenders by creating the appearance, through false closing documents and gift letters, that the down payment was being provided by the purchaser, when in fact it was being provided by the seller.

## B.     The Inadvertent Pretrial Disclosure

In the course of providing discovery to the government, Gott's trial counsel gave the government three documents, consisting of four pages, which contained statements by Gott that were subject to the attorney-client privilege or were work product. The issues for trial included whether Dobson and Gott made down payments for purchasers though disguised gifts by fictitious "family members" and whether they engaged in such acts with the intent to defraud. Dobson and Gott intended to defend the government's allegations, in part, by claiming that Keith Smartt, a mortgage broker, had told them that a gifter need not be a family member.

One of the disclosed documents, an email from Gott to his counsel, stated that Gott had called several mortgage companies to ask whether they had any programs that allowed the seller to contribute the down payment and all of them said no. Gott stated that he then called Keith Smartt, who said that several lenders had gift loan programs, under which, "as long as the funds were sourced and seasoned for 30 days, the lenders did not care where the gifter got their funds from." Gott further stated, however, that in a subsequent conversation with both Dobson and

Gott, Smartt said that "it did not matter where the gifter got the funds from as long as it was from a family member."

Upon discovering the foregoing documents, the government's counsel contacted Gott's counsel, who confirmed that the disclosure was inadvertent. The government's counsel also sought advice from his office's Professional Responsibility Officer and the Department of Justice's Professional Responsibility Advisory Office. Subsequently, the government filed a Motion for Judicial Inquiry, seeking the district court's guidance on how to proceed.

The district court held a two-hour hearing on the matter, during which it thoroughly explored the issues with Gott's and the government's counsel and questioned Gott. Gott's counsel confirmed that the disclosure was inadvertent, that the email contained attorney-client privileged information, and that Gott did not intend to waive the privilege. Gott's counsel explained that most of the information in the email, including Smartt's involvement, had previously been disclosed to the government through other means and suggested that precluding the government from using the email at trial would be an appropriate remedy. After the district court speculated about possible indirect uses of the email, Gott's counsel confirmed that the email did not disclose a defense theory or identify any witness of whom the government was previously unaware. The government's counsel confirmed that the government had previously interviewed Smartt and said that, because certain questions he intended to ask (or probably would have asked) Gott if Gott chose to testify at trial might be construed as derivative of Gott's email, it would "be hard to unring the bell." As such, the government's counsel noted, the email might inhibit his cross-examination of Gott at trial. Dobson's counsel attended the hearing but did not speak.

The district court then heard from Gott. Gott said that the court should not only prohibit the government from using the email at trial, but should also remove anyone from the prosecution team that had read the email. The court questioned Gott about how the information in the email might harm Gott's case, but Gott was unable to identify any harm—simply that the prosecutors would always have the information in the back of their minds. Gott's counsel did not comment on Gott's suggestion. The court observed that removal of the prosecution team was a "radical remedy" not appropriate for the circumstances because the disclosure was unintentional, the government played no part in it and took prompt and appropriate remedial steps, and removal would impose a "tremendous hardship on the government" after all of the time the attorneys and other staff spent preparing the case. Thus, the district court precluded the government from using the email in its case-in-chief, but said that it might allow it for impeachment if Gott were to testify inconsistently with his email.

## C.     Trial Proceedings

At trial, the government called several witnesses who had purchased lots from Southern under the no-money-down program.

Bernard Mosconi first met Dobson at a meeting in Florida in September 2007 to discuss investing in property at The Preserve. At a subsequent meeting at which Dobson was present, Mosconi received a brochure that described Southern's financing programs, including a no-money-down option. Mosconi thought that the no-money-down program seemed too good to be true and told Dobson that it "sound[ed] like fraud," but Dobson assured Mosconi that he had disclosed the program to the banks and said that the loans were collateralized with other property that Southern owned. Dobson also told Mosconi that Southern would make the mortgage payments for the first three years. Mosconi ultimately purchased two lots in The Preserve.

Mosconi initially made the down payments on both lots himself, but Southern reimbursed him for the down payments after the closings—as Dobson had promised. Mosconi promoted The Preserve and received commissions when he found other buyers for Southern. On occasion, Mosconi, at Dobson's request, made down payments for other purchasers, and Dobson repaid Mosconi after the closings. Eventually, Southern stopped making the mortgage payments on Mosconi's lots, and Mosconi was forced to file bankruptcy.

Jim Tobin, like Mosconi, learned about The Preserve at the meeting with Dobson in Florida in September 2007. Tobin purchased a lot in The Preserve, and Southern made his down payment and his mortgage payments. Tobin recommended The Preserve as an investment to others, including his pastor, Patricia Daniels. Tobin told Dobson that Daniels had "outstanding credit" but little cash, and Dobson responded, "Don't worry about it. We'll take care of it." Daniels purchased three lots for approximately $750,000, and Southern provided the down payments for all three transactions. Southern sent a $67,770 check to Daniels for the down payment on one of the properties. When Tobin learned that the funds would not be available for closing because Daniels's bank was going to put a ten-day hold on the funds, Dobson and Gott instructed Tobin to have Daniels sign the check over to Tobin so that Tobin could deposit it into his own bank account and then wire the funds to the title company for the closing.

Sherlene Connor participated in two gift-letter purchases for Southern. The first purchase was by Dwayne Jiles, Connor's boyfriend. At Gott's request, Connor signed a gift letter falsely stating that Jiles was Connor's cousin. The gift letter was intended to enable Jiles to make the down payment. Gott sent Connor $22,000, which she then transferred to Jiles for the down payment. Dobson and Gott subsequently asked Connor to sign another false gift letter for a transaction involving purchaser Louise Joseph, whom Connor had never met. Connor obliged,

and signed a gift letter stating that she was Joseph's cousin and was gifting $40,000 to her for the purchase of the property. Dobson transferred the $40,000 from Southern's bank account to Gott, who in turn transferred it to Connor.

Tahira Malik was told by her cousin, Naveed Malik, that because she had "excellent credit," she could get paid money for allowing Southern to use her credit to buy property. Tahira was not required to provide funds for the down payment. Instead, in an email, Gott explained the instructions for gift funding, including that he would wire $22,000 to Naveed's daughter, Tania Malik, and Tania would then write Tahira a personal check for $22,000 that included a notation, "gift funds." Gott also attached a gift letter for Tania to sign. The down payment amount for the transaction was $39,794, but Tahira did not pay any of it with her own funds. Instead, in addition to the $22,000, Gott transferred $17,794.87 from Southern's account for the closing. Initially, Tahira thought that something was not right about the proposed transaction, but Dobson and Gott assured her that the transaction was legitimate.

Special Agent Ruffin of the FBI testified about his meetings with Dobson and Gott. In Agent Ruffin's meeting with Dobson, Dobson admitted that various persons, including lawyers, had advised him that it would be improper for anyone other than the purchaser to make down payments on property sales. Agent Ruffin said that when he met with Gott, Gott acknowledged that when gift funds were used in a transaction, the gift had to come from a family member. Gott initially denied knowledge of any wire transfer from Southern for purchasers' down payments, but he admitted knowing about the wire transfers in the Malik transaction after Agent Ruffin showed him copies of documents from that transaction.

Dobson and Gott both testified, claiming that the down payments provided to purchasers were actually part of a purchase-option or lease-back program. They also claimed that Keith

Smartt told them that the source of the funds did not matter in a gift-letter transaction. Smartt, whom Gott called to testify, said that he told Dobson and Gott that the gift-letter program allowed a borrower's family member to gift funds to the borrower for a down payment and certify that the funds were provided as a gift. Smartt said it "should have been pretty clear" to Gott from what Smartt said that the lender did not "care what family member [the gift] comes from." Smartt also observed that a representation in a gift letter that Southern used for one of the transactions made it "very" obvious that a party with an interest in the transaction, including the seller, could not provide the gift funds.

At the conclusion of the trial, the jury found Defendants guilty on Counts 1, 5 through 8, 11, and 12.[1]

### D.     Sentencing

Defendants' presentence reports determined that the amount of loss from the scheme was $13,747,770.16, based on conservative estimates. The probation officer determined that Dobson's total offense level was 36, resulting in an advisory guidelines range of 188 to 235 months' imprisonment. Because Gott was deemed to be a minor participant, his total offense level was 30, resulting in an advisory guidelines range of 97 to 121 months' imprisonment.

The district court held a sentencing hearing over six days to resolve Defendants' objections, which were primarily directed at the amount of loss. The government presented an exhibit prepared by Agent Ruffin that summarized more than 100 fraudulent loans involving Southern and identified the details of each transaction, including the amount of the lender's loss of loan principal.[2] Agent Ruffin explained that the total amount loaned as a result of

---

[1] The district court subsequently dismissed Count 7 for inadequate proof of venue.

[2] Defendants stipulated to the accuracy of the government's summary exhibit in order to avoid the need to go through every loan file.

Defendants' schemes was $44 million and that the lenders lost approximately $40 million. Agent Ruffin testified that the loss attributable to Defendants was approximately $13.7 million, based on funds that were traceable directly from Southern's account to purchasers for down payments. In addition, Agent Ruffin confirmed that the loss numbers included credits against loss, i.e., payments that were made on the loans or amounts that the lenders would have received from foreclosure on the properties.[3]

One of the specific loss issues concerned the value of 342.72 acres that Farm Credit Services, a victim-lender, donated to the Georgia Land Trust. The government offered to stipulate to a value of $4,000 per acre. Gott's witness, the chief appraiser for the county assessor's office, testified that the property at The Preserve was worth $3,200 per acre. Agent Ruffin testified that in no scenario would the property at The Preserve be worth $6.7 million, which would reduce the $13.7 million loss to less than $7 million—the threshold required to reduce Defendants' guidelines ranges. *See* U.S.S.G. § 2B1.1(b)(1)(K). In the end, the district court accepted Gott's assessor's testimony that the property was worth approximately $3,200 per acre and concluded that the loss for purposes of the sentencing guidelines was $11,800,000. Although Defendants argued that the district court should consider only losses presented to the jury and not acquitted or uncharged conduct, the court overruled the objection, concluding that the Sentencing Guidelines required it to determine the amount of loss resulting from the conspiracy alleged in Count 1, on which Defendants were convicted.

---

[3]On cross-examination, Agent Ruffin conceded that Fifth Third, a lender, had sold the property covered by the Jiles loan to Federal National Mortgage on October 4, 2011 for approximately $120,000 but that such amount was not credited in the government's exhibit. It appears that the $120,000 that Fifth Third realized on the sale was the only credit adjustment that would have reduced Agent Ruffin's net loss figure.

The court concluded that the resulting guidelines ranges were 151 to 188 months for Dobson, and 79 to 97 months for Gott.[4] After granting Defendants' motions for a variance, the court sentenced Dobson to 126 months' imprisonment and Gott to 75 months' imprisonment, imposed five years of supervised released, and ordered them to pay $3,091,650.56 in restitution.

## II.

### A.     Disclosure of Privileged Material

Dobson and Gott argue that Gott's counsel's pretrial disclosure of Gott's email violated their rights to a fair trial under the Fifth Amendment and interfered with their rights to counsel under the Sixth Amendment. Gott also argues that the district court should have removed the prosecutors and investigators from the case to remedy the prejudice from the disclosure. This court reviews the district court's factual findings for clear error, but reviews *de novo* the question of whether such facts give rise to a constitutional violation. *United States v. O'Dell*, 247 F.3d 655, 666 (6th Cir. 2001). A district court's determination regarding disqualification of counsel "will be upheld unless 'arbitrary' or 'without adequate reasons.'" *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008) (quoting *United States v. Mays*, 69 F.3d 116, 121 (6th cir. 1995)).

Initially, we note that Dobson lacks standing to assert a Sixth Amendment violation based on the disclosure of Gott's email. "Sixth Amendment rights are at bottom *personal* to the accused." *United States v. Blair*, 661 F.3d 755, 772 (4th Cir. 2011); *see also Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001) (noting that "[t]he Sixth Amendment right to counsel is personal to the defendant"). Accordingly, a defendant lacks standing to assert the Sixth Amendment rights of his co-defendant. *United States v. Ramirez*, 50 F. App'x 257, 258 (6th Cir. 2002) (citing

---

[4]The court sustained Defendants' objections to the number of victims, which lowered their guidelines ranges in Defendants' presentence reports by two levels.

*United States v. Sims*, 845 F.2d 1564, 1568 (11th Cir. 1988) ("Even if the agents' actions violated Olsen's right to counsel, Sims has no standing to assert this claim.")). Dobson was represented by separate counsel, his privileged communications were not disclosed, and the disclosed Gott email had no impact on Dobson's relationship with his counsel. Dobson thus has no standing to assert a Sixth Amendment violation based on an alleged interference with Gott's attorney-client relationship. In addition, Dobson fails to show that the disclosure deprived him of a fair trial. The government did not use Gott's email in any manner at trial against Dobson or Gott. Dobson had no right to object to the disclosure, nor did he have any reason to expect that Gott would not provide incriminating information to the government. In other words, Dobson's position was no different than if Gott had cooperated with the government and testified against Dobson. Thus, Dobson cannot show a constitutional violation.

Even *assuming* that Dobson does have standing and agreeing that Gott does have standing to assert a Sixth Amendment claim, such a claim fails because neither Defendant can show prejudice. A defendant's Sixth Amendment rights may be violated if the government intrudes on the attorney-client relationship and prejudice is shown. *See Weatherford v. Bursey*, 429 U.S. 545, 557–58 (1977); *United States v. Valencia*, 541 F.2d 618, 623 (6th Cir. 1976). Most often, the government actively intrudes into the attorney-client relationship. For example, in *Valencia*, the government arranged for a paid informant—a defense counsel's secretary—to interact with the defendant and his counsel. *See id.* at 620–21. Although some courts have suggested that the government's intentional invasion of the attorney-client relationship, without more, can result in a violation, *see Bishop v. Rose*, 701 F.2d 1150, 1156 (6th Cir. 1983) (citing *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979)), this court's precedent requires a

11

showing of prejudice, even when the intrusion is intentional. *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984).

The following factors provide some guidance in determining whether a Sixth Amendment violation has occurred:

> 1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; 3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government.

*Id.* at 585. Even where a violation has occurred, courts are free to impose an appropriate remedy "tailored to the injury suffered." *United States v. Morrison*, 449 U.S. 361, 364 (1981). The issue in *Morrison* was whether an assumed Sixth Amendment violation required dismissal of the indictment. *Id.* at 365–66. The Court held that it did not because there was no "demonstrable prejudice, or substantial threat thereof." *Id.* The Court explained,

> Our approach has . . . been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. . . . Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

*Id.* at 365. Moreover, the Court observed that the right to counsel must be balanced against "society's interest in the administration of criminal justice." *Id.* at 364.

The *Steele* factors show that no Sixth Amendment violation occurred in this case. First, there was no intrusion, intentional or otherwise, into Gott's relationship with his counsel. The government obtained Gott's email by happenstance rather than some deliberate act. Second, the government did not use Gott's email at trial. Although Defendants argue that the disclosure of

the email was fatal to their defense, they fail to explain why this is so. In fact, Gott testified consistent with the defense he sought to assert—that he did not believe what he was doing was wrong. Third, there is no indication that the government used Gott's email to either Defendant's detriment. As both Gott's trial counsel and the government's counsel told the district court, the government was already aware of Smartt, had interviewed him, and knew that Smartt had discussions with Defendants in which he told them that gift funds had to come from a family member.[5] While Defendants suggest that the government made some derivative use of the email, they fail to explain what information the government obtained that it did not already possess. Finally, the email disclosed no information about Gott's counsel's trial preparations. In short, Defendants have not met their "onerous task" of demonstrating prejudice. *United States v. Moses*, 337 F. App'x 443, 449 (6th Cir. 2009). For these same reasons, Defendants fail to demonstrate a due-process violation.

The argument that the district court should have removed the government's counsel and investigators and appointed a new prosecution team is without merit. Given the lack of any discernable prejudice, the district court sensibly described this request as a "radical remedy." The prosecutors had invested a significant amount of time preparing for trial, trial was set to start in a matter of weeks, the prosecutors were already aware of most of the information in the email through other means, and a less drastic remedy was available. The district court's remedy was thus appropriately "tailored to the injury suffered from [any possible] constitutional violation." *Morrison*, 449 U.S. at 364.

---

[5]Although at trial the government did ask Gott about his contact with other lenders, the government was already aware that Gott and Dobson had spoken to other lenders before they spoke with Smartt. Moreover, Gott opened the door to the inquiry by testifying on direct that he contacted other lenders.

We are also not persuaded that the district court erred in failing to appoint new counsel for Gott or by questioning him at the hearing on the motion for judicial inquiry. Gott never requested new counsel at the hearing, and he never informed the district court that he believed that there was a conflict. Nor do we view Gott's counsel's failure to support Gott's request for removal of the government's attorneys and agents as a conflict necessitating new counsel. Gott's request was unreasonable, and his counsel merely suggested a reasonable remedy. In addition, Gott fails to show how the district court's questioning of him violated his rights. The district court's questions were limited to the prejudice that might result to Gott from use of the email. The court did not delve into trial strategy, did not ask Gott questions about the substance of the email, and probed no further than necessary to fashion a proper remedy.[6]

### B. Evidence of Dobson's Intent to Defraud

Dobson contends that there was insufficient evidence for the jury to conclude that he intended to defraud lending institutions by providing down payments to borrowers. This court reviews *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010). "In reviewing the sufficiency of the evidence, the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The defendant's burden is a very heavy one. *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011). We must "give full credit to the

---

[6]Unlike the government, we do not read Gott's brief as asserting an ineffective-assistance-of-counsel claim. To the extent Gott does seek to assert such a claim, we decline to address the claim on direct appeal. *See United States v. Bradley*, 400 F.3d 459, 461–62 (6th Cir. 2005) (noting this court's practice, with rare exceptions, of declining to address ineffective-assistance claims because the trial record is generally insufficient to address counsel's performance).

responsibility of the jury to weigh the evidence, to make credibility determinations, and to draw inferences." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (citing *Jackson*, 443 U.S. at 319).

A conviction for wire fraud requires the government to prove three elements beyond a reasonable doubt: (1) "the defendant devised or willfully participated in a scheme to defraud"; (2) the defendant "used or caused to be used an interstate wire communication in furtherance of the scheme"; and (3) the defendant "intended to deprive a victim of money or property." *United States v. Speer*, 419 F. App'x 562, 567 (6th Cir. 2011) (quoting *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000) (internal quotation marks omitted)). "Intent to defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to another or bringing about a financial gain to oneself." *United States v. Olds*, 309 F. App'x 967, 972 (6th Cir. 2009).

Dobson cites several facts that he contends demonstrate that he lacked an intent to defraud. However, these facts do not undermine the jury's verdict. Some of the asserted facts— for example, contractor deed transactions involving Mr. Sanchez—are irrelevant to the counts of conviction. In addition, Dobson's assertion that he never discussed gift letters with Connor is flatly contradicted by Connor's testimony that Dobson requested her to sign a gift letter for the Joseph transaction and that he sent her an email with instructions on how to process a gift-letter transaction. Dobson also made the initial transfer of $40,000 from Southern's account to Gott, who then transferred those funds to Connor for the Joseph transaction. Similarly, when Tahira Malik told Dobson that she had concerns about the gift-letter transaction, Dobson assured her that nothing serious would happen and that Southern would take care of everything. Moreover, the government presented ample evidence that Dobson played a central role in promoting Southern's "no-money-down" program and assured prospective purchasers that everything was

above board. Finally, although Dobson asserts that he believed in good faith that the lenders did not care who supplied the funds to the gifter for gift-letter transactions, Agent Ruffin testified that Dobson admitted in the initial interview that he knew it would be improper for anyone other than the purchaser to make the down payment. Thus, sufficient evidence supported Dobson's wire fraud convictions.[7]

### C.    Sentencing Issues

Dobson and Gott each raise a separate sentencing issue concerning the district court's loss calculation. Dobson argues that the district court should have considered only the loan transactions that were the subject of the counts of conviction to calculate the loss. He notes that had the district court considered only the three gift-letter transactions on which Defendants were convicted, instead of the loan transactions set forth in the government's summary exhibit, the amount of loss would have been only $120,000, resulting in a much lower Sentencing Guidelines range. Gott argues that his sentence was procedurally unreasonable because the district court failed to reduce the loss amount by the amount of money that the victim recovered by selling the property, or by the fair market value of the property if the victim had not disposed of it at the time of sentencing, as required by Application Note 3(E)(iii) to Sentencing Guideline 2B1.1.

"[T]he district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004). However, we apply

---

[7]Dobson appears to argue that the jury instructions amounted to a constructive amendment of the indictment. He does not raise constructive amendment as an issue in his statement of the issues, nor does he attempt to develop it in any meaning way. Therefore, we decline to address it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)).

*de novo* review to the district court's methodology for calculating the loss. *United States v. Erpenbeck*, 532 F.3d 423, 433 (6th Cir. 2008).

In mortgage-fraud cases, the court follows a two-step approach in determining loss. *United States v. Wendlandt*, 714 F.3d 388, 393–94 (6th Cir. 2013). First, "under U.S.S.G. § 2B1.1, the court must use the greater of actual or intended loss." *Id.* at 393. Actual loss is usually the appropriate measure in cases involving fraudulent mortgage loans. "'Default by a woefully unqualified home-loan borrower is so likely that . . . the pecuniary harm . . . will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan.'" *Id.* at 393–94 (quoting *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010)). In the second step, "the district court must reduce the loss by the amount of money the victim recovered by selling the collateral, or the fair market value of the property at the time of sentencing if the victim has not disposed of the collateral." *Id.* at 394 (citing U.S.S.G. § 2B1.1 cmt. n.3(E)(ii)). The district court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C).

### 1. Pertinent Loan Transactions

Dobson argues that the district court erred by considering the uncharged and acquitted loan transactions included in the government's loss summary exhibit because those transactions differed markedly from the gift-letter transactions for which Defendants were convicted. We disagree. The conspiracy count charged Defendants with a scheme to defraud in which they deceived mortgage lenders by creating the appearance through false closing documents, including gift letters, that the purchasers were providing their own down payments when, in fact, Southern was providing them. All of the transactions the district court considered were part of the scheme for which Defendants were charged and convicted. In each transaction, Southern provided funds for the down payment to the purchaser and hid this fact from the lender. Thus,

the district court did not err in considering those transactions in calculating the amount of loss caused by the conspiracy. In addition, the law is well settled that a district court may consider both acquitted and uncharged conduct in determining a defendant's relevant conduct, provided that such conduct is similar to the conduct underlying the offense of conviction and is established by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 157 (1997); *see also United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc) ("So long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range."); *United States v. Maken*, 510 F.3d 654, 658 (6th Cir. 2007) ("[R]elevant conduct is not limited to conduct for which the defendant has been convicted."). Because the acquitted and uncharged mortgage transactions were similar to the conduct for which Defendants were convicted, the district court properly considered them in its loss calculation.

### 2. Credit Against Loss

Gott claims that the government's loss exhibit failed to take into consideration amounts that the lenders recovered in foreclosure sales or from selling the mortgages. He also argues that the district court's per acre valuation of the donated property failed to consider that each parcel sold for a different price and some parcels had unique characteristics that made them worth more than others. We review Gott's claims only for plain error because he failed to raise them below. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this

adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001).

Gott cannot establish any error, let alone plain error. Although he claims that the district court failed to apply credits against the loss, Gott does not identify any particular sale or amount that the court should have applied to reduce the loss. In contrast, Agent Ruffin testified that the loss amounts that the lenders furnished for the summary exhibit included "credits against loss." Gott failed to challenge this testimony. Furthermore, Gott does not refute Agent Ruffin's testimony that there was no conceivable scenario where the loss would be reduced to under $7 million. Gott also fails to support his assertion that the district court erred in valuing the donated land. The district court accepted the testimony of Gott's own witness and valued the donated property at $3,200 per acre. Gott fails to cite any persuasive basis to conclude that the district court's valuation was erroneous, nor does he cite any evidence supporting his claim that the district court improperly valued the property as total acreage rather than on the basis of individual parcels.

## III.

For the foregoing reasons, we **AFFIRM** Defendants' convictions and their sentences imposed by the district court.